## No. 11,885.

SUCCESSION OF AMELIE RIXNER, WIFE OF COUNT JOSEPH DE SAR-
ZANA—OPPOSITION OF THE BOARD OF ADMINISTRATORS OF THE
CHARITY HOSPITAL TO FINAL ACCOUNT, ETC.

A citizen and subject of Italy is exempt from the payment of the ten per centum tax
levied againt foreign heirs, on property situated in this State, under Act 130 of
1894, the title to which is derived by testamentary disposition of his mother's
will, she having likewise been a citizen of Italy at the date of her death.

The "most favored nation clause" of the treaty between Italy and the United
States entitles citizens and subjects of the former to the same tax exemptions
as the citizens and subjects of the latter are; and the same right to acquire and
dispose of personal and real property within the territory of the latter, by
donation, testament or otherwise, from or to aliens and subjects of the former.

It is both wise and conservative for courts to adhere to what has been repeatedly
adjudged; and when the intent and meaning of a law has been settled by the
uniform and consistent course of judicial construction, the construction
becomes, in so far as contract and treaty rights acquired thereunder are con-
cerned, as much a part of the law as the text itself.

APPEAL from the Civil District Court for the Parish of Orleans,
Monroe, J.

*Charles F. Claiborne* for Succession, Appellee, *Henry Denis* as
*Amicus Curiæ* submitted a brief on same side.

*Branch K. Miller* for Opponent, Appellant.

Argued and submitted November 21, 1895.
Opinion handed down February 10, 1896.
Rehearing refused March 23, 1896.

The opinion of the court was delivered by

WATKINS, J.   The opponent claims 10 per centum on whatever amount shall be due on decedent's account to Ignazio Vincanzo de Sarzana, the heir instituted under a will, said heir being domiciliated in Marcella, and a citizen and subject of the kingdom of Italy, and the succession of the testatrix being administered in the parish of Orleans, Louisiana.

The opposition was, after due proceedings and trial, dismissed, and the executor's account approved and homologated; and the opponent has appealed.

In the lower court the case was tried and decided upon an agreed statement of facts, the purport of which is as follows, viz.:

1. That the universal legatee under the will of Amelie Rixner, Ignazio de Sarzana, is a minor, and not domiciliated in or a citizen of the State of Louisiana, or of the United States of America.

2. That he is a citizen and subject of the kingdom of Italy, wherein he now resides, and where he has always resided, and has his domicile.

3. That the property proposed for distribution on the account that is opened consists of the following, viz.:

| | | |
|---|---:|---:|
| Immovables valued at | $70,100 00 | |
| Movables valued at | 574 23 | $70,674 23 |
| Less debts stated on the account the total is | | $67,848 38 |

4. That Joseph de Sarzana is the father and tutor of said minor, and Jules Andrieu, of the city of New Orleans, Louisiana, is the agent and attorney in fact of the said tutor.

5. That the treaties between Italy and other nations and the United States are contained in the volume which is entitled "Treaties and Conventions between the United States and Other Powers," and same is to be used in the original for all the purposes of this case.

The volume referred to is produced in the original as constituting part of the transcript.

Opponent propounds its claim under and in pursuance of the terms and provisions of Act 130 of the General Assembly of the State of Louisiana, approved on the 11th of July, 1894; and it claims that under said act "every person not domiciled in this State, and not being a citizen of any State or territory of the Union, who shall be entitled, whether as heir, legatee or donee, to the whole or any part of the succession of a person deceased, whether such person shall

have died in this State or elsewhere, shall pay a tax for the benefit of the Charity Hospital of ten per cent. on all sums due on the value of all property which may have actually been received from said succession, or so much thereof as is situated in this State, after deducting all debts due by the said succession."

That it is made the duty of the executor, curator, etc., having charge of the administration of the succession property belonging to a person residing out of the State, " to retain in his hands the amount of the tax imposed, and pay the same over to the treasurer of the Charity Hospital," etc.

He demands that the executor of the estate of the deceased comply with the law and pay over to the said administrators ten per centum of the net value thereof.

The executor resists opponent's demand and says that he is protected from making the payment demanded, and against the provisions of said law, by the clauses of the treaty between Italy and the United States concluded, ratified and proclaimed in the year 1871, and especially by Art. XXII thereof, which provides:

" The citizens of each of the contracting parties shall have power to dispose of their personal goods within the jurisdiction of the other, by sale, donation, testament or otherwise, and their representatives being citizens of the other party shall succeed to their personal goods, whether by testament, or *ab intestato*, and they may take possession thereof, either by themselves or others acting for them, and dispose of the same at their will, paying such duties only as the inhabitants of the country wherein such goods are shall be subject to pay in like cases.

"As for the case of real estate the citizens and subjects of the two contracting parties shall be treated on the footing of the most favored nation."

His averment is that this court in placing an interpretation upon similar rights of French citizens and the subjects of Bavaria held that they were protected against the operation and effect of similar statutes under and by virtue of treaties existing between the United States and France and Bavaria, respectively, and that the legatee of Mrs. Amelie Rixner ought to be afforded like protection by the treaty above cited and relied upon.           •

That, in so far as the statute upon which opponent relies is opposed to or comes in conflict with said treaty stipulation, same is

null and inoperative, as in contravention of section two (2) of Art. 6 of the Constitution of the United States, viz.:

" This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

Counsel for opponent has employed, substantially, the language of the legislative act which is relied upon for the enforcement of the tax demanded. Act 130 of 1894.

It purports to be a revival of the provisions of Secs. 1221, 1222 and 1223 of the Revised Civil Code, relative to the tax due by foreign heirs, which was repealed by Act 86 of 1887; and also to amend the same.

The act of 1877 merely repealed, in terms, the sections of the Civil Code referred to, and corresponding provisions of the Revised Statutes.

A careful comparison instituted between the provisions of the articles of the Civil Code and the statute of 1894, above referred to, discloses that the institution of the Charity Hospital as the beneficiary in lieu of the State is the only difference between them. These articles have no counterpart in the Code Napoleon, and were for the first time introduced into our own Code in its revision in 1870, being the codification of Sec. 7 of Act 315 of 1855.

Counsel for the executor has accurately quoted the language of the treaty of the United States with Italy.

Treaties and Conventions between the United States and Other Powers, pp. 581-587 (Article XXII).

As it appears from the agreed statement of facts, that the decedent's succession *exclusively* consisted of *real* estate, it is manifest that the executor chiefly relies on that clause of the treaty with Italy which declares that " as for real estate the citizens and subjects of the contracting parties shall be treated on the footing of the most favored nation," therefore an examination of the provisions of some of the treaties which the United States has made is important.

The following is an extract from the treaty which was concluded between the President of the United States and the Emperor of the French, and proclaimed on the 12th of August, 1853, viz.:

Article VII. "In all the States of the Union, whose existing laws permit it, so long and to the same extent as the said laws shall remain in force, Frenchmen shall enjoy the right of possessing personal and real property by the same title and in the same manner as the citizens of the United States. They shall be free to dispose of it as they may please, either gratuitously or for value received, by donation, testament, or otherwise, just as those citizens themselves; and in no case shall they be subjected to taxes on transfer, inheritance, or any others different from those paid by the latter, or to taxes which shall not be equally imposed." Treaties and Conventions, p. 352.

The first sentence has exclusive reference to the right of Frenchmen to "enjoy the *right of possessing* personal and real property by the same title and in the same manner as the citizens of the United States," and the *second* declares that "Frenchmen shall be free to *dispose* of their property as they may please," and "in no case shall they be subjected to taxes on transfer, inheritance, or any others, different from those paid by the latter, or to taxes which shall not be equally imposed."

It is with the latter that we are alone concerned, as no question has been raised with reference to the right of Frenchmen to *acquire* and *hold* property in either of the States of the Union, and to that alone does the language of the treaty refer.

The treaty of Bavaria is as follows, TREATIES AND CONVENTIONS (p. 46):

"ART. III. The citizens or subjects of each of the contracting parties shall have power to dispose of their real and personal property within the States of the other by testament, donation or otherwise; and their heirs, legatees and donees being citizens or subjects of the other contracting party shall succeed to their said (real and) personal property, and may take possession thereof either by themselves or by others acting for them, and dispose of the same at their pleasure, paying such duty only as the inhabitants of the country where the said property lies shall be liable to pay in like cases."

The foregoing is an extract from the treaty which was concluded between the United States and the King of Bavaria, and proclaimed on August 16, 1846. Treaties and Conventions, p. 46.

The Spanish treaty provides as follows, viz.:

"ART. II. The citizens and subjects of each party shall have power to dispose of their personal goods within the jurisdiction of the other, by testament, donation or otherwise, and their representatives being subjects or citizens of the other party shall succeed to their said personal goods, whether by testament or *ab intestato*, and they may take possession thereof, either by themselves or others acting for them, and dispose of the same at their will, paying such dues only as the inhabitants of the country wherein the said goods are shall be subject to pay in like cases."

The foregoing is an extract from the treaty which was concluded between His Catholic Majesty and the United States, and proclaimed on August 2, 1876.   Treaties and Conventions, p. 1009.

The German treaty provides as follows, viz.:

"ART. X, Sec. 3: In all successions to inheritances citizens of each of the contracting parties shall pay in the country of the other such duties only as they would be liable to pay if they were citizens of the country in which the property is situated, or the judicial administration of the same may be exercised."

The foregoing is an extract from the treaty which was concluded between the United States and the German Empire, and proclaimed June 1, 1872.   Treaties and Conventions, p. 366.

The treaty with Great Britain provides as follows, viz.:

"ART. IX. It is agreed that British subjects who now hold lands in the territories of the United States, and American citizens who now hold lands in the dominion of His Majesty, shall continue to hold them according to the nature and tenure of their respective estates and titles therein, and may grant, sell or devise the same to whom they please, in like manner as if they were natives, and that neither they nor their heirs or assigns shall, so far as may respect the said lands and the legal remedies incident thereto, be regarded as aliens."

The foregoing is an extract from the treaty which was concluded between the United States and his Britannic Majesty, and proclaimed on the 29th of February, 1796.   Treaties and Conventions, p. 385.

It will be interesting and instructive to examine and consider the legislation of this State on this subject and the course of our jurisprudence under it as auxiliary to our investigation and decision of the question at issue.

The first enactment on the subject is Act 95 of 1828, Sec. 1 of which declares "that any person who is not a citizen of the United States, or is not domiciliated in any part of said States shall be subject to pay to this State ten per cent. on all sums which may be due to him as heir, legatee or donee by any succession which may be opened in this State."

This act was repealed in 1830 and was again re-enacted in 1842— being incorporated in the general revenue law of that year in slightly altered language. Sec. 4, Act 154 of 1842.

The terms employed are, "that each and every person not being domiciliated in this State, and not being a citizen of any State or territory in the Union who shall be entitled," etc.

It is again reproduced in the general revenue law of 1850 in the following terms, viz.:

"Every executor, curator, tutor, or administrator having charge or administration of succession property belonging in whole or in part to a person residing out of this State and not being a citizen of any other State or territory of the United States shall be bound to retain in his hands the amount of the tax imposed by law," etc. Sec. 76 of Act 194 of 1850.

As this statute did not repeal former laws, except those on "the subject treated in this act," the language of the section quoted may be regarded as a legislative interpretation of former laws on the subject mentioned.

But the identical language which is employed in the statute of 1842 is reproduced, *in totidem verbis*, in the law of 1855, Sec. 7 of Act 315 of 1855.

In this condition the law remained until the revision of the Civil Code in 1870. *Vide supra.*

The same language is preserved in Revised Civil Code, 1221; but in defining the duties of succession representatives, with regard to this tax, the language employed is: "A person residing out of the State, and not being a citizen of any other State or Territory." R. C. C. 1222. And in the next section the language is: "Persons who are neither residents of this State nor citizens of any other State or Territory." R. C. C. 1223.

These articles of the Code and their corresponding provisions in the Revised Statutes were repealed in 1877; and there was no law on the subject until the statute of 1894 was enacted. *Vide supra.*

This act follows the language of the articles of the Code very closely; and it declares the legislative purpose to be to *revive* the same.   Act 130 of 1894.

It thus appears that the phraseology of the legislation on the subject has remained, practically, unaltered since 1842; and that the statute of that year continued uninterruptedly in force until 1877; and there has been no law on the subject since until 1894.

Taken chronologically, the treaties referred to were proclaimed in the following order of dates, viz.:

That of Great Britain on February 29, 1796.

That of Spain on August 7, 1796.

That of Bavaria on August 16, 1846.

That of France on August 12, 1853.

That of Italy on November 23, 1871.

That of Germany on June 1, 1872.

It is readily observable that in the last two there is a change of phraseology different from the language of our statutes and that of some of the previous treaties.   For, in the "most favored nation" clause of the Italian treaty the language employed is, "the citizens and subjects of the two countries," and in the German treaty it is "citizens of each of the contracting parties."

And the language of the Spanish treaty is "the citizens and subjects of each party;" but that of the British treaty is, "British subjects" and "American citizens."

The Bavarian treaty employs the phrase "the citizens or subjects of the contracting parties," while the French treaty says "Frenchmen shall enjoy the same rights as citizens of the United States."

To relieve our minds of any complexity in the matter, the decisions of this court have come to the rescue in determining the true meaning of "the most favored nation" clause of the Italian treaty, in giving an interpretation to some other treaties, the effect of which is to subordinate our statutes thereto and place the citizens and subjects of other countries upon the same plane as the *citizens* of our own State.

As best calculated to present the controverted question in the clearest light, the case of State of Louisiana vs. Succession of Poydras, 9 An. 165, which was decided in 1854, may be taken as the initial point in our jurisprudence, as the tax in controversy was laid under the act of 1850, and the court in the course of its decision

took occasion to attract attention to the fact that the statute embraced "persons residing out of this State," and those, also, " not citizens of *any other* State or Territory of the United States," and said :

" From this view of the statute we conclude that the tax attaches not only to property falling to alien heirs who are non-residents, but also to the property falling to citizens of our own State residing abroad. The successions falling to non-resident heirs who are citizens of any other State or territory of the United States than Louisiana are alone exempted from it, and this exemption was probably intended to satisfy the requirements of the second section of the fourth article of the Constitution of the United States."

The effect of that decision was that the language of the law of 1850 rendered citizens of Louisiana residing abroad liable to the tax, while exempting therefrom citizens of " any other State " of the Union.

At the date when that case arose the French treaty bad not been concluded, but it was concluded in the following year.

During the year 1855 the Succession of Dufour, 10 An. 391, was decided, Mr. Chief Justice Slidell being the organ of the court, and having been the organ of the court in State vs. Poydras, *supra*.

The decedent, in that instance, having been a Frenchman by birth, while Julien Poydras was one by adoption, and the death of the latter occurred *prior* to the conclusion of the French treaty, and that of the former *two days* subsequent thereto—the heirs in each case having the recognized status of French subjects when the successions were opened respectively. In the course of their decision the court said :

" That by a reasonable and just interpretation of the terms of the (French) treaty, the exemption from taxation for which its seventh section provides applies to this case."

And holding the provision of the treaty to have been within the constitutional prerogative of the president, they said it must be " obeyed as supreme; that, consequently, the statute of Louisiana (1842) has become *pro tanto* inoperative during the continuance of said treaty."

Judgment of the District Court enforcing the provisions of the French treaty and relieving the French subjects from the payment of the tax was affirmed.

A forcible illustration of the view which was by this court entertained of the provisions of the French treaty is found in Succession of Prevost, 12 An. 577, which was decided in the year 1857. Referring to the decision in Succession of Dufour, *supra*, the court said:

"The present case, however, differs from that of Dufour in the essential particular that Prevost died many years before the conclusion of the consular convention with France, and the right of the State of Louisiana to tax consequently attached at a period when French citizens did not enjoy an exemption from the operation of the act of 1842."

The court thus completely eliminated from consideration the act of 1850 and affirmed the principle of exemption which was announced in the Dufour case.

Subsequently the Prevost case was considered by the Supreme Court and their opinion will be hereafter considered by us.

The principle of the Dufour case was affirmed in Succession of Amat, 18 An. 403.

In Succession of Crusius, 19 An. 369—decided in 1867—the heirs of the resident succession, being citizens of Bavaria, were exempt from the payment of a tax which was levied under the act of 1855 by virtue of the stipulations of the Bavarian treaty of 1846, affirming the Dufour and Amat cases.

The question of the liability of Frenchmen to the payment of a tax levied under the act of 1855 arose in 1878, and was considered in Succession of Marquis de Circe, Manning's Unreported Cases, 412, decedent's death having occurred in 1869 in France.

The court held that the act of 1855 was a *revisory* statute, which merely reiterated the provisions of the act of 1842, saying:

"It formed a part of the general revisory legislation, which has been had periodically in this State. * * * It was simply a reproduction of the laws of previous years, which had existed long anterior to the date of the (French) treaty. It was not a new enactment," etc., but a reproduction of the statute of 1842.

The French heirs were relieved from the payment of the tax on authority of the Dufour and other cases cited.

This was the condition of our law and jurisprudence when, in 1870, the Civil Code was revised, and the provisions of the act of 1842 were incorporated therein as Arts. 1221, 1222 and 1223.

36

They each continued without alteration until 1877, when those articles were expressly repealed, and so remained until 1894, when the Legislature *revived* them, and re-enacted them in terms and without change in phraseology.    This, notwithstanding no alteration has been made in the treaty rights of citizens of other countries; and no contrary decision of this court has been intermediately rendered.

Under " the most favored nation" clause of the Italian treaty, which was concluded in 1846, the instituted heir of the decedent is entitled to have as favorable construction put upon his property rights in this State as have been accorded by this court to Frenchmen under the treaty with France, or to the subjects of Bavaria.

The intimation of the court in the Poydras case, to the effect that the act of 1850 contemplated that property in this State coming to *citizens of our own State* residing abroad" was liable to the tax, has not been followed in any subsequent decision of this court; and *that act* has not been considered in any subsequent decision of this court.

Omitting from consideration the word *other*, as it has been eliminated from all statutes since 1850, the citizens of Louisiana alone are dealt with in our law and the adjudications of this court, and they are put upon the same plane in this regard as the citizens of other States and countries are by the terms of the treaties.

The British treaty employs the terms " British subjects" and "American citizens." That of the Spanish treaty is " the citizens and subjects of each party." That of Germany is the " citizens of each of the contracting parties." That of Bavaria is same as that of Germany. That of France is " Frenchmen shall enjoy " the rights enjoyed by " the citizens of the United States." Fredericson vs. State, 23 Howard, 447.

All of these treaties deal with the respective property rights of the citizens of the contracting parties, and not with those of inhabitants merely.

Not only is this true of the treaty stipulations respecting French citizens, but the law of France provides that " every child born of a Frenchman in a foreign country is French." C. N. 10.

" A foreigner shall enjoy in France the same civil rights as are or shall be accorded to Frenchmen by the treaties of that nation to which such foreigner shall belong." C. N. 11.

The comity existing between the two countries seems to be perfect and complete.

The petition of the opponent has closely followed the phraseology of the act of 1894, and avers that "every person not domiciliated in this State, and not being *a citizen of any State* or Territory"— thus including, necessarily, the *citizens of Louisiana.*

The phraseology of the act of 1894 was not *accidentally* employed by the Legislature; but it was manifestly employed with the purpose of keeping our law in line with the provisions of *previously existing* treaties, and which are "the supreme law of the land." Sec. 2, Art. 6, U. S. Const.   The act of 1894 *reviving* the articles of the Code which has been repealed *fifteen years previously,* could not, in any event, have the effect of breaking the force of the repeated decisions of this court giving an interpretation to the law of 1842, which had been kept uninterruptedly in force until its repeal by the Legislature in 1877.

The manner in which the treaty rights of all nations have been treated for so great a length of time by the Legislature of the State and its highest court is not to be lightly considered.

However, some reference has been made to some decisions of the Supreme Court as possessing some features which are antagonistic to this view.

One of the cases cited and relied upon is Prevost vs. Gremoux, 19 Howard, 1, in which the Succession of Prevost, 12 An. 577, *supra,* was reviewed on a writ of error.

The court held that the right to tax was completely vested in the State when *Prevost* died, and was not divested by the treaty subsequently concluded, and that the heirs of the deceased acquired their rights *subject to the tax.*

But the court observed, in affirming the judgment of this court, "that the obligation of the treaty and its operation in the State, after it was made, depend upon the laws of Louisiana;" and then added the further observation that the operation of the treaty is "expressly limited" to the States of the Union whose laws "permit it, so long and to the same extent as those laws shall remain in force; and there is no act of the Legislature of Louisiana repealing the law"—the law of 1842, under which the tax in question has been levied—" and accepting the provisions of the treaty," etc.

The foregoing paragraph of that opinion was pressed upon our attention in the DeCirce case, and the court was, on its account,

urged to *reverse* the ruling of their predecessors in the Dufour and other cases; but this insistence did not prevail, and the ruling in the Dufour case was adhered to.

But, independently of that consideration, it must be borne in mind that the act of 1842 was repealed in 1877, and was not again revived until 1894; and in the meanwhile, *if not before,* the provisions of the French treaty were operative.   And the subsequent *revival* of the law could not abrogate or defeat them.

The next case cited is Frederickson vs. State of Louisiana, 23 Howard, 445, which involved an interpretation of the Bavarian treaty, and a decision of this court also.   In that case the court, through Mr. Justice Campbell, said:

"The case before the court in Louisiana concerned the distribution of a succession of a *citizen of that State,* and of property situated there;" and then added that they concurred with this court in the opinion that the treaty does not regulate the testamentary dispositions of citizens or subjects of the contracting powers, in reference to property within the country of their origin or citizenship. The cause of the treaty was that the citizens and subjects of each of the contracting powers were or might be subject to onerous taxes upon property possessed by them within the State of the other, by reason of their allegiance; and its purpose was to enable such persons to dispose of their property, paying such duties only as the inhabitants of the country where the property lies pay under like conditions.

" The case of a citizen, or subject of the respective countries, *residing at home,* and disposing of property there, in favor of a citizen or subject of the other, was not in the contemplation of the contracting powers, and is not embraced in this article of the treaty."

The opinion of the court in that case does not, in any way, militate against the decisions of this court.

The record shows that Amelie Rixner died at Marcella, Sicily, where she was domiciled; and, at that place, she executed her last will, on the 24th of July, 1892.   That her property is situated in Louisiana, where her succession is being administered; and her universal legatee resides at the place of of her domicile.

It is therefore evident that this case does not come within the purview of that decision.

This investigation has led us to the conclusion that the situation of the parties to this litigation is the same, identically, as that of the litigants in the Dufour and other cases; and that the heir of the deceased is quite as much entitled to the protection of the French treaty as were the subjects and citizens of France—he having invoked the benefit of "the most favored nation" clause in the Italian treaty with the United States.

In Levy vs. Hitsche, 40 An. 501, we said, after a careful review of the authorities, that after the intent and meaning of a law has been settled by judicial construction, the construction becomes, in so far as contract rights acquired under it are concerned, as much a part of the law as the text itself; and the same rule must be true in so far, also, as treaty rights and obligations are concerned. *Vide* Douglas vs. County of Pike, 101 U. S. 677; State vs. Thompson, 10 An. 122.

It is both wise and conservative for courts " to adhere to what has already been adjudged."

Entertaining this view we deem it unnecessary to examine and decide the constitutionality of Act 130 of 1894; for, accepting the same in its fullest force, it yields precedence to the treaty stipulations invoked as part of the supreme law of the land.

Judgment affirmed.