### No. 12,275.

### SUCCESSION OF PABLO SALA.

50 1009
50  626

1. The parties designated by Act No. 130 of 1894 as those to be charged under its provisions with a succession or inheritance tax are foreign heirs and legatees.

2. The words *personal goods* In the first clause of Art. XI of the treaty, entered into on the 27th of October, 1795, and proclaimed on the 2d of August, 1796, between the United States and Spain, refer to and cover *movable* property only. Real estate or immovable property is referred to and dealt with in the treaty only in its third clause.

3. The only action taken by the two governments in respect to real estate, or immovable property, was to deal with and provide for the consequences of the special case, where foreigners in either country should be prohibited from inheriting immovable property. The effect of this limited action is to leave Act No. 130 of 1894 (unless unconstitutional) operative upon immovable property as against foreign heirs and legatees, except to the extent that it is controlled and limited under the third clause of the treaty, under the condition of affairs therein specially anticipated and provided for.

4. Act No. 130 of 1894 is an act raising revenue and appropriating money, and should, under Art. 35 of the Constitution, have originated in the House of Representatives. Having originated in the Senate it is decreed unconstitutional.

5. There is nothing in the language of Act No. 130 of 1894 making the payment of a succession or inheritance tax by foreigners a condition precedent to a right of inheritance. Ths law permits the foreigner to inherit, but, having inherited, charges him with the tax. Succession of Pargoud, 13 An. 367; Succession of Rabasse, 49 An. 1405.

ON APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*Branch K. Miller* for Charity Hospital of New Orleans, Plaintiff and Appellant.

*Henry Denis* for Foreign Legatee, Defendant and Appellee.

Argued and submitted February 2, 1897.
Opinion handed down March 15, 1897.
Rehearing granted June 19, 1897.
Argued and submitted on rehearing February 25, 1898.
Opinion handed down March 21, 1898.

The opinion of the court was delivered by

NICHOLLS, C. J.　Pablo Sala, a resident of the parish of Orleans, died in said parish on the 25th of October, 1894, leaving a last will and testament in which he appointed George W. Nott his testamentary executor, and in and by which he constituted as his universal legatee his sister, Dona Maria Sala y Fabrigas, residing in Lloret de

Mar in Spain. Inventories were taken of the succession from which it appeared that the deceased left in the State real estate and also movable property and credits. Nott qualified as executor.

In April, 1895, the Charity Hospital at New Orleans brought suit in which it prayed that there be judgment in its favor, condemning the executor, Nott, to pay over and deliver to the treasurer of the Charity Hospital the sum of twelve thousand five hundred dollars, or such sum as might be equal to ten per cent. upon all sums, or the value of all property which might fall to or become due to said Maria Sala, universal legatee of Pablo Sala.

The demand was based upon the provisions of Act No. 130 of 1894 and upon the allegations that in this succession there fell to the universal legatee, Maria Sala, under and and by virtue of the last will and testament of the deceased, property and assets amounting to, at least, one hundred and twenty thousand dollars after all the debts of the succession had been paid or discharged. That George W. Nott was the executor of the deceased and was in charge of and had the administration of the succession property belonging to or falling to the universal legatee. That said legatee resided out of the State of Louisiana and was not a citizen of any other State or Territory of the United States, but a citizen or subject of the kingdom of Spain. That it was the duty of the executor to retain in his hands the tax for the benefit of the Charity Hospital of ten per cent., for which, under the provisions of said Act No. 130, the said legatee was liable, and to pay the same to the treasurer of the Charity Hospital.

The act referred to is entitled "An act to amend and re-enact Arts. 1221, 1222 and 1223 of the Civil Code relative to the tax due by foreign heirs, legatees and donees, repealed by Act No. 86, approved April 20, 1877."

It reads as follows:

"Be it enacted by the General Assembly of the State of Louisiana, That Arts. 1221, 1222 and 1223 of the Revised Civil Code relative to the tax due by foreign heirs, legatees and donees, repealed by Act No. 86 of 1877, Extra Session, be amended and re-enacted so as to read:

"ART. 1221. Each and every person not being domiciliated in this State, and not being a citizen of any State or Territory in the Union, who shall be entitled whether as heir, legatee or donee to the whole or any part of the succession of a person deceased, whether

such person shall have died in this State or elsewhere, shall pay a tax for the benefit of the Charity Hospital in New Òrleans of ten per cent. on all sums on the value of all property which he may have actually received from said succession, or so much thereof as is situated in this State, after deducting all debts; when the inheritance, donation or legacy consists of specific property, and the same has not been sold, the appraisement thereof in the inventory shall be considered as the value thereof.

"ART. 1222. Every executor, curator, tutor or administrator having the charge or administration of succession property belonging in whole or in part to a person residing out of the State and not being a citizen of any other State or Territory, shall be bound to retain in his hands the amount of the tax imposed and to pay over the same to the treasurer of said hospital, in default whereof every such executor, curator, tutor or administrator and his securities shall be liable for the amount thereof.

"ART. 1223. It shall be the special duty of clerks of court to see that the tax imposed by the preceding section be collected and paid over; and each of such clerks shall be bound to furnish the auditor and the treasurer of said hospital once in a year a statement or list of the successions opened in his parish whereof persons who are neither residents of this State nor citizens of any other State or Territory in the United States are heirs, legatees or donees, in whole or in part, and of the amount accruing to such persons, and any clerk failing to furnish such statement or to comply with the provisions of the law relative to vacant successions shall be responsible to the State for the amount due."

Before plaintiff's petition was put at issue Dona Maria y Fabrigas was, by decree of the District Court, recognized as the universal legatee of the deceased and put in possession as such.

This decree was rendered with the consent of the Board of Administrators of the Charity Hospital, under an agreement entered into between the board and the legatee, that in order to secure the Charity Hospital in case final judgment should be rendered in favor of the plaintiff on the present demand, a certain plantation, known as the Zeringue plantation, should not be sold by the legatee. Dona Maria Sala y Fabrigas (Maria Sala) having been placed in possession, answered plaintiff's petition. Having first pleaded the general issue she admitted that she was the universal legatee of Pablo Sala,

and that she was a subject and citizen of the kingdom of Spain, but further answering she averred that she was not liable for the tax claimed, that the provisions of Act No. 130 of 1890 were inoperative and of no effect as to her for the reason that she is protected against the said law by the treaty of Spain with the United States of America, entered into of the 27th of October, 1795, notified on the 25th of April, 1796 and proclaimed on the 2d of August, 1796, which treaty was still in force and operation. That the inhabitants of the State of Louisiana are not subject to pay any dues, taxes or imposts of any kind upon successions, legacies, or donations to which they are, or may be, entitled, and that no such dues, taxes or imposts are imposed or levied upon them as such heirs, legatees or donees, and therefore she, under the treaty, was not liable to a tax. That Act. No. 130 of 1894 was in violation of Art. 35 of the Constitution.

The portion of the treaty relied on is its eleventh article, which is as follows:

## ARTICLE XI.

" The citizens and subjects of each party shall have power to dispose of their personal goods within the jurisdiction of the other by testament, donation or otherwise, and their representatives being sujects of the other party shall succeed to their said personal goods, whether by testament or *ab intestato*, and they may take possession thereof, either by themselves or others acting for them, and dispose of the same at their will, paying such dues only as the inhabitants of the country wherein the said goods are, shall be subject to pay in like cases.

" And in case of the absence of the representative, such care shall be taken of the said goods as would be taken of the goods of a native in like case until the lawful owner may take measures for receiving them.

" And if questions shall arise among several claimants to which of them the said goods belong, the same shall be decided finally by the laws and judges of the land wherein the said goods are. And where on the death of any person holding real estate within the territories of the one party, such real estate would by the laws of the land descend on a citizen or subject of the other were he not disqualified by being an alien such subjects shall be allowed a reasonable time to sell the same and to withdraw the proceeds without

molestation, and exempt from all rights of detraction on the part of the government of the respective States."

The District Court rendered judgment in favor of the defendant, rejecting the claim of the Charity Hospital, and it appealed.

The position of the plaintiff is thus stated in the *syllabus* of the brief filed in their behalf:

" Article XI of the Treaty of 1795 between the United States and the kingdom of Spain guarantees to the citizens or subjects of the contracting parties acquiring property by testament, donation or inheritance, situated in the territory of the other, specific rights as to movable and immovable property so acquired; the rights as to each class of property are different and distinct fiom the other; as to movables, the only guarantee given is that the citizens or subjects of the one shall pay no dues or charges not imposed upon the citizens or subjects of the other situated in like circumstances (and a portion of our citizens are liable to this tax) ; that as to immovables, the only right conferred is that where the laws of the State in which the property is situated prohibit an alien from acquiring real estate, such alien shall have a reasonable time to dispose of his legacy or inheritance and to remove the proceeds without molestation.

" As under the laws of this State a Spaniard may acquire real estate by a title either gratuitous or onerous, the case contemplated by the treaty can not arise."

Plaintiff maintains that it is the duty of the court to enforce the law in every respect in which its provisions are not squarely covered by the treaty; that a portion of our own citizens are liable to pay this tax. Defendant urges that the words " personal goods" in the treaty do not mean " personal property" in the sense of the common law of England and the United States, or movables in the sense of the civil law. That it is evident that the expression "personal goods" is synonymous with the Spanish term " *bienes personales*," which, like the French word "*biens personels*," signifies " property personal to the party," whether it be movable or immovable, and includes both. That personal or movable property in Spanish would be " *bienes meubles;*" * * * that as the article of the Spanish treaty saving the succession property of the citizens of both countries from taxation is the same *verbatim* as the article of the Italian treaty, the decision in the Rixner succession (48 An. 552) should dispose of the present case."

She pleads the unconstitutionality of Act No. 130 of 1894 should the plea be necessary to protect her rights. We think that the two governments in stipulating that " heirs, legatees and donees should pay such dues only as the inhabitants of the country wherein the said goods are shall be subject to pay in like cases," intended to give to the very flexible word " inhabitants" as broad a signification as would be needed to insure to the citizens of each country the full protection which it was the obvious intention of both the contracting parties to secure. Were it true (although the tax imposed by the act of 1894 is referred to in the title of the act as a tax due by " foreign heirs, legatees and donees"), that the General Assembly had in view the imposition of a succession tax upon citizens of Louisiana living away from the State, we would not be justified in holding that that fact would bring the defendant under the provisions of that act. Upon that hypothesis only an extremely small and exceptional fraction of the people of Louisiana would be brought under the operation of the statute, and we would see no parallelism in our imposing a tax on citizens absent from this State and imposing one on Spanish heirs or legatees absent from Louisiana. It was suggested on one occasion by a judge of this court that a similar statute (subsequently repealed) was enacted partially with a view of striking a blow at absenteeism, then prevailing to a great extent, but if such was really the motive it would be difficult to find a ground on which we could predicate an intention on the part of either country to extend the provisions of such a *quasi*-penal statute so as to make it cover citizens of the other residing at their own home. To extend a statute imposing a succession tax upon heirs or legatees citizens of Louisiana who reside abroad to Spanish heirs or legatees, living in their own country, would be to take out of the treaty most of its life, leaving its benefits almost nominal. We would not feel warranted in giving to the treaty the narrow scope contended for, leading, as it would, to results evidently not contemplated. We are of the opinion that the object of the treaty was to secure the citizens or subjects of each from being discriminated against under the laws of the other for or on account of their alienship. This object would be entirely thwarted if the Spanish heirs and legatees living in Spain could be successfully discriminated against by being made to fall under the ban of statute discrimination, either actually or apparently aimed at

what would be (if so aimed) only exceptionally and at a very small proportion of the people of the State. Most Spanish heirs and legatees would be in that precise situation. We would hold that Spanish heirs and legatees under the treaty were entitled to share in the benefits accorded generally to the people of the State. We do not think, however, that the statute of 1894 was aimed at any portion of our people. The title of the act, as we have already noticed, discloses that its provisions were directed against aliens, for the tax is therein referred to as one due by " foreign " heirs, legatees and donoes. The first section of the statute, which is that which imposes the tax, designates as the parties to be taxed persons not domiciliated in the State and not citizens of any State or Territory in the Union. This designation of the parties to be charged with the tax is not broadened by any subsequent section of the statute—the first section controls the act throughout. For a double reason we think that plaintiff's demand against defendant, in so far as it is based upon the movable assets of the succession, is not well founded.

We are next to consider what the situation is in respect to the tax claimed upon the immovables of the estate. The treaty deals directly and expressly *eo nomine* with immovables only in respect to the legal results which would be made to flow under the laws of either country, should foreigners be prohibited from owning real estate. It concedes the existence of a continuing power and authority in the two governments to control and regulate the disposition of immovable property within their respective borders—a power of control which governments have much more jealously and tenaciously adhered to and insisted upon than they have upon a similar control over movables. Civil Code, Arts. 9 and 10. In view of that continuing power and with reference to a possible exercise of the same by either country in its harshest and broadest discrimination against foreigners through an obsolete prohibition of their owning immovable property the two governments stipulated that should this reserved power be so brought to bear by either upon aliens the citizens of the other should be none the less protected in their substantial rights of ownership in respect to the same. The property was to be made to enure to the benefit of the foreign heir by being converted into money and the money so obtained was to be received and held free from all charges against it by the government. The immovable was to be considered practically for the purpose of ultimate benefit to

the Spanish heir as if it had been a movable from the opening of the succession. By relation back and for that purpose it was to be dealt with as a movable.

Plaintiff's position is that the effect of the failure of the two governments in express terms to take any action in the treaty in reference to immovable property other than the special action just. mentioned, is to leave the law of 1894, except under that special condition of affairs, operative against foreign heirs and legatees in all other respects as to that species of property, unless the law itself be unconstitutional. We are therefore called on to see whether we are authorized to give to the words " personal goods" found in the first paragraph of the eleventh article of the treaty the meaning attributed to them by the defendant and make them cover immovable property. The treaty appears to have been drawn up in English. Whether there was or was not a Spanish duplicate of the same we do not know. If there was a duplicate we have not been informed what words appear therein as those corresponding to the terms we are now considering. Defendant concedes that as English words they convey an idea opposed to that for which she is contending. The right of disposal in connection with the words " personal goods" in the first paragraph of the article is there referred to as an absolute one, not one which was in contemplation of parties. susceptible of being withdrawn by either, while the language employed in dealing with the special case of aliens who might be prohibited from inheriting real estate does not, though found in the same article, present the case by way of *proviso* or exception to what had already gone before, but as an independent proposition on an independent subject not connected with the rights which had already been therein fixed and provided for.

We are of the opinion that the words " personal goods " in the first clause of Art. XI of the treaty were intended to cover and do refer to and cover movable property exclusively, and that immovable property or real estate is referred to and dealt with in the treaty only in its third clause.

We are further of the opinion that the only action taken by the two governments in respect to immovable property was to deal with and provide for the consequences of the special case where foreigners in either country should have been prohibited from inheriting real estate, and that the effect of this limited action is to leave the

act of 1894 (unless unconstitutional) operative upon immovable property as against foreign heirs and legatees, except to the extent that it is controlled and limited under the third clause of the treaty under the condition of affairs therein specially anticipated and provided for.

The view which we take of the treaty forces upon us an examination of the constitutionality of Act No. 130 of 1894. The statute is attacked as being in conflict with Art. 35 of the Constitution, which requires that all bills for raising a revenue and appropriating money to originate in the House of Representatives. It is conceded that the act originated in the Senate. Plaintiff denies that the act is one raising revenues, or appropriating money. It claims that the statute is a legal limitation upon the right of inheritance; that it simply affixes as a necessary condition for the existence of a capacity to receive by succession the payment of a certain sum; that the claimant can not urge the right and, at the same time, repudiate the condition on which it was granted; that the money ordered to be paid is that of the individuals who pay it and not funds of the State, and therefore there can be no "appropriation" made in the sense that term is employed in Art. 35 of the Constitution; that the House of Representatives is designated as the body to originate bills for revenue upon the theory that the citizens of the different parishes are specially concerned in the imposition of taxes, as it is from them and their property that they are to be taken, and the members of the lower house are considered more directly the representatives of the taxpayers than are members of the Senate—that these moneys are to be drawn from aliens, and the people of the State have no interest or concern in the question whether they should be made pay, and if so, how much the amount should be.

We see nothing in the language of the statute making the payment of the tax a condition precedent to a right of inheritance. The law permits the foreigner to inherit, but, having so inherited, charges him with the payment of the tax. The property and property rights of the foreigner found within the State are subject to taxation as is other property. C. C. 9. Its ownership is immaterial. The fact that a succession right accrues to foreign heirs or legatees, and the funds to arise therefrom are liable to be immediately transferred to a foreign country, furnishes no good or sufficient legal reason why, while in the State, they or their owners should not be taxed like other

persons, or other property therein. The legislation is proper revenue legislation.

The beneficiary of the fund to be raised from foreign heirs, legatees and donees under the act of 1894—the Charity Hospital—is a public institution of the State—one sustained almost exclusively by State appropriations, authorized to be made on its behalf under Art. 204 of the Constitution. All moneys reaching its administrators under the act would reach it as having been derived really from the State, lightening, to that extent, the necessity of State direct aid. Neither the mere form or process by which and through which the funds would be transmitted to the institution, nor the limited number of persons to be affected by the legislation, would change the character of the contribution or alter the real source from which they came. In our opinion the act is one intended to raise a revenue by a tax on property rights in the State, and one in reality appropriating the revenue to be derived therefrom to one of the public institutions of the State. That legislation of the character of that contained in the act of 1894 has been considered in the light of legislation concerning taxation will appear from an examination of the revenue acts of 1848 and 1850.

For the reasons herein assigned it is ordered, adjudged and decreed that the judgment appealed from be and the same is hereby affirmed.

Mr. Justice Watkins concurs in the decree and that part of the opinion which relates to the unconstitutionality of the legislative act.

Mr. Justice Miller concurs in the decree.

## On Application for Rehearing.

Nicholls, C. J. Upon the argument on the rehearing of this case, counsel of the appellee presses upon us very earnestly that we have given to the words " personal goods " in the treaty too restricted a meaning. He directs our attention to the French text of a number of treaties entered into between the United States and different governments in which the words "*personal property*" (*biens personels*) are used in place of "*personal goods*," and he insists that the words " personal property " therein were employed simply to characterize property as belonging personally to the subjects of the one or the other country, and not as descriptive of *movable* property and, as contradistinguished from immovable property or real estate. An examination of the French texts referred to shows that the words " personal

property" have been ordinarlly used in treaties of a character closely resembling that of the Spanish treaty we are now considering instead of the words " personal goods," but we can not reach the same conclusions from that fact that counsel does. Under the view taken by counsel, the word " personal" could be dropped out entirely as " *surplusage*," the intentions of the treaty-making powers being fully made known without it. We do not think that that word was either inadvertently or unadvisedly inserted. In the French treaty of 1853 " *personal property* " is brought sharply into mention and contrasted with *immovable* property as being a distinct class from it.

Article XI of that treaty declares that—

" In all the States of the Union whose existing laws permit it, so long and to the same extent as the said laws shall remain in force, Frenchmen shall enjoy the right of possessing *personal and real property* by the same title and in the same manner as the citizens of the United States * * *. As to the States of the Union by whose existing laws aliens are not permitted to hold *real* estate, the President engages to recommend to them the passage of such laws as may be necessary for the purpose of conferring this right.

We think that the language adopted in these various treaties was so adopted by reason of a recognition by the different powers of the right of the others to control the *ownership of immovable property* within their respective territories and to leave them free to take such action in respect thereto as to them might be deemed right, except in so far as was made the subject *matter of specific stipulation* in the treaties themselves. This specific stipulation generally extends no further than to guarantee in favor of the subjects of the contracting parties, who would be called to the inheritance of real estate in the territory of the other, but for the fact of alienage, not the *actual ownership of such property* but the practical *benefits* of ownership by permitting them to sell the property, or to have the same sold for their benefit without restriction or " detraction."

By this stipulation, the unwillingness or policy of either of the contracting parties to permit aliens to own real estate within their borders would be respected, without, however, carrying the effect of such policy any further than was actually necessary for its own enforcement.

Subject to the single restriction provided for, the State was left in full possession of the right recognized *in* Mager vs. Grima, 8 Howard,

494, and Frederickson vs. State, 23 Howard, 445. In the former case, the Supreme Court of the United States said: " Every State or nation may unquestionabiy refuse to allow an alien to take either real or personal property situated within its limits either as heir or legatee, and may, if it thinks proper, direct that property so descending or bequeathed shall belong to the State. In many of the States of the Union at this day, real property devised to an alien is liable to escheat. And if a State may deny the privilege altogether, it follows that when it grants it, it may annex to the grant any conditions which it supposes to be required by its interests or policy. This has been done by Louisiana. The right to take is given subject to a deduction of ten per cent. for the use of the State."

The State of Louisiana has not made the right of Spanish subjects to inherit real estate within her territory conditioned or contingent upon the payment of ten per cent. upon the value of said real property for the use of the State. It has, however, enacted a law that Spanish subjects so inheriting shall pay a tax. We find nothing in the treaty prohibiting the State in the matter of *real estate* from passing such a statute. In our opinion, the treaty stipulations do not reach that branch of the case. It is argued that reaching such a conclusion would lead up to incongruous results. It is said that it can scarcely be reconciled with logic that in a State where hostility to aliens is so great, that they are prohibited from taking real estate by inheritance, the foreigner would be able to get under the treaty the full benefit of the inheritance, while in a State showing a much more liberal spirit toward aliens and permitting them freely to inherit, they should find themselves confronted with a payment of tax of ten per cent.

The legal privilege of a continuing ownership in the foreigner after inheritance of the property inherited is left out of view in this statement, but whether the results reached be incongruous or illogical or not, we are not able to control them. We are called on to declare non-effective, a statute of the State by reason of alleged treaty obligations, and an examination of the treaty has brought us to the conclusion that the particular obstacle set up in bar of the enforcement of the law can not stand. This conclusion forces us back into a consideration of the law from the standpoint of its constitutionality under the Constitution of the State on the ground discussed and disposed of in our original opinion.

A re-examination of the question has not brought us to a conclu-sion different from that which we have already reached and expressed. The history of the statute shows it to have been enacted as a revenue measure as its principal motive and object. We see no reason to suppose that there has been a change of policy on the part of the people of the State in dealing with the [right [of aliens to inherit real estate. The right of foreigners to inherit real estate in this State has not been made to be conditioned or contingent upon the payment of a tax, as we recently declared in the Succession of Rabasse. Spanish subjects living in Spain inherit freely from persons dying in Louisiana owning real estate. They have the right to accept unconditionally the successions falling to them, and should they (having done so) sell the real estate inherited to third parties, the rights of the vendees *quoad* the *title* of the property sold would be proof against any attack made against it that the vendor's right was conditional or contingent. Succession of Pargoud, 13 An. 367.

We find a great difference between this statute and one under which moneys are to be received only incidentally and subsidiarily as a result or consequence of a main object had in view by the statute (other than the raising of revenue), even though the moneys so received should be directed by the statute when received to be applied to State purpoees.

We are of the opinion that the judgment heretofore rendered by us should remain undisturbed, and it is so ordered and decreed.

JUSTICE WATKINS concurs in the decree on the ground that the Louisiana statute is unconstitutional.