In re Estate of John Peterson, Deceased.

TAXATION: Collateral Inheritance Tax—Treaty—"Goods and
1  Effects"—Words and Phrases. "Goods and effects" include real
estate within the meaning of the treaty between the United
States and Sweden which provides that "the subjects of the con-
tracting parties in the respective states may freely dispose of
their goods and effects, etc.," the original of the treaty being in
the French language and the French term for "goods and effects"
including real property.

TAXATION: Collateral Inheritance Tax—Treaty—"Droit de Detrac-
2  tion"—Words and Phrases. "Droit de detraction" is an inter-
national law term and means a tax levied upon the removal from
one country to another country of property acquired by succes-
sion or testamentary disposition. The term has no reference to
succession or inheritance taxes.

TAXATION: Collateral Inheritance Tax—Treaties—Limitation on
3  States. No limitation whatever on the power of the state to
levy a collateral inheritance tax and no limitation on the power
of the state to discriminate or graduate such tax according to
whether the property passes to residents or to nonresident aliens
is contained in that clause of the treaty between the United
States and Sweden providing that the subjects of the two coun-
tries "in the respective states may freely dispose of their goods
and effects by testament, etc. . . . in favor of such persons
as they may think proper and their heirs . . . shall receive
the succession even ab intestato," and providing that "these in-
heritances . . . which the subjects . . . in changing their
dwelling, shall be desirous of removing from the place of their
abode, shall be exempt from all duty called 'droit de detraction.'"

*Appeal from Plymouth District Court.*—Hon. Wm. Hutchin-
son, Judge.

Friday, January 22, 1915.

Appeal from an order subjecting the estate of John Peter-

son, deceased, to the payment of an inheritance tax. Decedent's heirs appeal.—*Affirmed.*

*Nelson Miller,* (G. T. Struble, of counsel) for appellants.

*George Cosson,* Attorney General, *C. A. Robbins,* Assistant Attorney General, and *Clarence D. Roseberry,* for appellee.

DEEMER, C. J.—John Peterson, a native of Sweden, but a naturalized citizen of the United States, died intestate in Plymouth County, Iowa, on March 13, 1909, unmarried, and without any direct heirs. His heirs were nephews and nieces, or their surviving spouses or children, who took from one-fourth to one-eighteenth of his estate. One nephew and one niece are naturalized citizens in the states of Illinois and Wisconsin respectively. The other heirs are non-resident aliens, living in Sweden. The estate consisted of eighty acres of land, appraised at $8,800.00, and personal property valued at $5,386.42. The administrator of the estate tendered to the state treasurer the sum of $848.95 in full of the collateral inheritance tax due to the state, being five per centum of the valuation of the property, with interest, which the treasurer refused to receive, claiming that under the law the estate passing to non-resident aliens was subject to a twenty per centum tax.

Conceding that the law of this state in force at the time of testator's death, and at the time of the hearing in the district court, exacted a twenty per centum tax upon property passing to collateral heirs who were non-resident aliens, counsel for these heirs, and for the administrator, insist that this law was and is invalid because of a treaty between the United States and the Kingdom of Sweden first concluded in the year 1793 between the proper authorities of the two governments, and afterwards revived, first in the year 1816, and again in 1827. As the treaty now stands, it reads as follows:

"Article I. (in part): The citizens and subjects of each of the two high contracting parties may, with all security for their persons, vessels, and cargoes, freely enter the ports,

places and rivers of the territories of the other, wherever foreign commerce is permitted. They shall be at liberty to sojourn and reside in all parts whatsoever of said territory; to rent and occupy houses and warehouses for their commerce; and they shall enjoy generally, the most entire security and protection in their mercantile transactions, on condition of their submitting to the laws and ordinances of the respective countries.

"Article II. Swedish and Norwegian vessels, . . . shall be treated . . . upon the same footing as national vessels . . . with respect to the duties of tonnage, lighthouses, pilotage, and port charges, as well as to the perquisites of public officers, and all other duties or charges of whatsoever kind or denomination, levied in the name, or to the profit, of the government, the local authorities, or of any private establishment whatsoever."

Article VI of the original treaty, revised by Article XVII of the present one, provides that, "The subjects of the contracting parties in the respective states may freely dispose of their goods and effects either by testament, donation or otherwise in favor of such persons as they think proper; and their heirs in whatever place they shall reside, shall receive the succession even *ab intestato* either in person or by their attorney without having occasion to take out letters of naturalization. These inheritances as well as the capitals and effects, which the subjects of the two parties in changing their dwelling, shall be desirous of removing from the place of their abode, shall be exempted from all duty, called '*droit de detraction*' on the part of the government of the two states, respectively. But it is at the same time agreed that nothing contained in this article shall in any manner derogate from the ordinances published in Sweden against emigration or which may hereafter be published, which shall remain in full force and vigor. The United States on their part or any of them shall be at liberty to make, respecting this matter, such laws as they think proper."

The sixth article of this treaty is the one relied upon by appellants. Appellants' counsel seem to concede that the entire estate is subject to the five per centum tax imposed generally upon all collateral inheritances; but they argue that anything in excess of that is contrary to both the letter and the spirit of the treaty. On the other hand, it is contended that the treaty does not apply to real estate in any event, and that there is no provision therein which deprives the state of its power to collect inheritance taxes upon property within its borders, and nothing either in the treaty or in either the Federal or State Constitution which inhibits the imposition of a greater tax where the property passes to non-resident aliens than that imposed where it passes to either resident citizens or aliens.

Some of the propositions involved are not the subject of debate. It is conceded that the state has plenary power over the descent or succession of property within its borders, save as such right may be limited by some constitutional or treaty provision; that an inheritance tax is not fundamentally a tax upon property, but upon the right of succession or the right to receive property by will or descent; and that there is no provision, unless it be found in the treaty, requiring inheritance taxes to be uniform. In other words, it is practically agreed that our inheritance tax law is valid unless when properly construed it be found to conflict with the treaty rights and obligations.

We may here pause long enough to dispose of one of the contentions made for the State, to the effect that real estate passing by will or descent is not covered by the provisions of the treaty relating to "goods and effects." It may be conceded that, generally speaking, these terms are not broad enough to cover real estate; but they may be and often are construed to include such property. They have often been so construed when found in treaties. See cases cited, *In re Anderson*, 166 Iowa 617.

1. TAXATION: collateral inheritance tax: treaty: "goods and effects": words and phrases.

A different interpretation seems to have been placed upon them in *Meier v. Lee,* 106 Iowa 303, but the case seems to be treated as one of first impression and little attention was given the authorities upon the proposition. The matter is fully and exhaustively covered in *Adams v. Akerlund,* 48 N. E. (Ill.) 454, with the result that real estate was held to be included within the terms of the treaty. As shown in that case this treaty, like all the early ones, was written in French and the French terms for goods and effects include all kinds of property, both real and personal. Story on *Conflict of Laws,* 8th Ed. 13, Note 1.

II.    The fundamental question here is, Does the treaty deprive the state of its right to impose what are known as inheritance taxes where the property within its borders passes to collateral heirs, or does it require that such taxes, if imposed, be uniform, that is, at the same ratio upon alien and citizen alike, or upon residents and non-residents in equal proportions? Appellants do not contend that the state has no right under this treaty to impose any inheritance tax, but rather that it has no right to impose one tax upon property passing to residents and another and higher tax upon it when passing to non-resident aliens; asserting in this connection that the difference in rate is in effect a *droit de detraction,* or duty of detraction, and for that reason prohibited by the treaty. This right of detraction seems to have acquired a well-established meaning in international law. As we understand it, it is a tax levied upon the removal from one state or country to another of property acquired by succession or testamentary disposition, and it does not cover taxes upon the succession to or transfer of property. *Frederickson v. Louisiana,* 23 How. (U. S.) 445; *In re Strobel's Estate,* 39 N. Y. Supp. 169.

The sentence in Article VI of the original treaty quoted, beginning with the words "these inheritances," clearly has

2. TAXATION: collateral inheritance tax: treaty: "droit de detraction": words and phrases.

reference to removal taxes or duties, or, as they are called

3. TAXATION:
collateral in-
heritance tax:
treaties: limi-
tation on
states.

in the language of diplomacy, *"droit de de-traction,"* and not to succession or inherit-ance taxes. If there be anything in the treaty which forbids the levy of inheritance or succession taxes by the state, it is found in the first sentence of Article VI, which provides for the free disposition by will, gift or otherwise, by the subjects of the contracting parties in the respective states, in favor of such persons as they think proper; and that their heirs, no matter where resident, may receive the succession without taking out letters of naturalization. The words *"ab intestato"* mean from an intestate. If this provision is to be given the effect contended for, it would relieve the property of a subject of this country dying intestate, of all collateral or other inheritance taxes, provided his heirs are subjects of the Kingdom of Sweden, no matter where their residence.

Another possible construction of this treaty is that it applies only to a subject of one of the contracting parties resident in the territory of the other. If that be the proper interpretation, then it does not apply to this controversy for the reason that deceased was a naturalized citizen of this country when he died, and but for the first clause of the initial paragraph of Article VI of the treaty, a state inherit-ance or succession tax would be perfectly lawful. Treating the first paragraph as relating to subjects of either country residing at home, it is manifest that there is nothing therein which forbids the levy of inheritance or succession taxes, when the property passes *ab intestato* to the heirs of such subject, no matter whether they be residents or non-residents, aliens or subjects. The term "freely dispose of" does not, as we view it, relate to property passing by descent. Such property is covered by the next sentence of the treaty, and in that there is no reference whatever to any taxes or duties. The only language with reference to property acquired by descent is found in the next sentence, relating to the duty called *droit*

*de detraction,* and as we have seen, that does not cover succession or inheritance taxes.

Were we to give the treaty the broad significance claimed for it, it would give to subjects of the Kingdom of Sweden, whether residents or non-residents of this country, greater rights in the property of an intestate than are possessed by our own citizens; for no succession or inheritance taxes could be imposed upon any property passing to them *ab intestato.* There is, as we see it, no middle ground. Either property passing to non-resident Swedish aliens by descent or through inheritance is subject to a valid succession tax, or it is not; and the amount of the tax is not the criterion by which to determine the validity thereof. Appellants' counsel practically concede that the property was subject to a five per centum tax notwithstanding the treaty, and, as we understand it, claim that all in excess of the five per centum is a duty of detraction inhibited by the clause of the treaty now being considered. As already stated, we do not regard this tax as a *droit de detraction.* It is not imposed upon the removal of the property, but upon the right to take or receive the same by descent or inheritance. Indeed, it is not in a strict sense a tax upon property at all. The tax is imposed before it reaches the heir or devisee, as the case may be, and the property passes after it has suffered a diminution to the amount of the tax; the portion exacted as a tax never reaches the person taking the estate. Such is the uniform holding of the cases. *In re Anderson,* 166 Iowa 617; *Herriott v. Bacon,* 110 Iowa 342; *Knowlton v. Moore,* 178 U. S. 41, 55; *U. S. v. Perkins,* 163 U. S. 625; *Scholey v. Rew,* 23 Wall. (U. S.) 331; *Ferry v. Campbell,* 110 Iowa 290; *In re Stone,* 132 Iowa 136. Such being its nature, there is no constitutional requirement that such taxes be uniform, or, in the absence of a treaty, that they be the same when the property passes to aliens as when it descends to citizens. The tax may be progressive in character and discriminatory in the sense that it may be collected from property passing to collateral heirs alone, property passing

to direct heirs being entirely exempt or subject to a much less rate. *Booth's Ex'r. v. Kentucky,* 113 S. W. 61; *In re Benton,* 84 N. E. 1026; *Union Trust Co. v. Durfee,* 84 N. W. (Mich.) 1101; *In re McPherson,* 10 N. E. 685; *Nunnemacher v. State,* 108 N. W. 627 (Wis.) 9 Ann. Cases 711; *State v. Vinsonhaler,* 105 N. W. (Neb.) 472; *In re Wilmerding,* 49 Pac. (Cal.) 181; *Magoun v. Ill. Tr. & Svgs. Bk.,* 170 U. S. 283; *Minot v. Winthrop,* 38 N. E. (Mass.) 512; *In re Johnson,* 73 Pac. (Cal.) 424; *Mager v. Grima,* 8 How. 490, 493; *Wunderle v. Wunderle,* 19 L. R. A. 84; *Blythe v. Hinckley,* 180 U. S. 333.

Is there anything in the treaty in question which requires uniformity of this tax upon property passing to citizens of this country and to citizens of and subjects of the Kingdom of Sweden? The Supreme Court of Washington, in a learned opinion by PARKER, J., thought there was, although two of the Justices dissented. See *In re Stixrud,* 109 Pac. 343. The doctrine of this opinion seems to be that the treaty guaranteed equality between citizens and aliens, and that the testamentary and inheritance rights secured thereby were such that they could not be impaired except as such rights and privileges of citizens might be impaired by the laws of their own country. No cases were cited which directly supported this proposition. On the contrary, in each of the cases relied upon in support of the rule, there was an express provision that alien heirs might succeed to and take possession of property passing by succession or by will, and dispose of the same, paying such duties only as the inhabitants of the country wherein the goods may be shall be subject to pay in like cases. *Frederickson v. Louisiana,* 23 How. (U. S.) 445; *Schultze v. Schultze,* 33 N. E. 201; *In re Sala,* 24 So. 674; *Rixner's Succession,* 19 So. 597.

To the contrary of the holding of the Supreme Court of Washington is *In re Strobel's Estate,* 39 N. Y. Supp. 169. See also *In re Anderson's Estate, supra.*

In the Washington case, the treaty was construed as if it contained a clause usual to such conventions, "that in all

successions to inheritances citizens of each of the contracting parties shall pay in the country of the other such duties only as they would be liable to pay if they were citizens of the country in which the property is situated, or the judicial administration of the same may be exercised.'' We find no warrant for such assumption.

Doubtless no reference to succession or inheritance taxes was made because such were unknown to this country at the time the original treaty was negotiated, and although such taxes had become quite general either in Europe or in England when the treaty was last made, there was no change in its phraseology, and the matter was left open to state action. In the recent case of *McKeown v. Brown*, 167 Iowa 489, which involved the treaty between this country and Great Britain, it was held that as the treaty expressly covers succession and inheritance taxes, and provides that no more should be exacted from subjects of Great Britain than from citizens or subjects of this country, the twenty per centum tax imposed by our statute on property passing to non-resident aliens was invalid, at least to the extent of the excess over five per centum assessed on property passing to citizens and subjects of this country.

Finding nothing in the treaty under consideration which exempts property within this jurisdiction passing to collateral heirs, be they citizens or aliens, from the collateral inheritance tax, and nothing providing for or guaranteeing uniformity therein, nothing to the effect that they shall be the same upon property passing to collateral heirs without regard to their citizenship, we are constrained to hold that there is nothing in our law in conflict with any of the treaty rights guaranteed to the citizens or subjects of the Kingdom of Sweden residing therein.

This is the pivotal point in the case, and although the conclusion is in conflict with the learned opinion of the Washington Supreme Court, hitherto mentioned, we are not convinced of the soundness of its conclusion, and although we

have read and reread that opinion, it is obvious that the conclusion reached is a strained one, due largely to the thought that the treaty was perhaps intended to and doubtless should have been so made as to exempt property passing to nonresident aliens, no matter of what nationality, from every sort of succession or inheritance taxes, save such as were levied upon and collected from property passing to citizens and subjects of this country. We would be glad to come to this conclusion were we able to find language which would justify it, but after a careful study of the document we are forced to the conclusion that this treaty absolutely prohibits the levy of any succession or inheritance taxes upon property passing to collateral heirs, citizens and subjects of the Kingdom of Sweden, or that it contains no limitations whatever. As said in the beginning, there is, to our minds, no middle ground. No one contends that it absolutely inhibits all succession taxes, and we find no warrant for saying that it permits the levy of such taxes but only to the extent that they may be levied upon property passing to citizens and subjects of this country, or perhaps, to citizens and subjects residing abroad.

The distinction between this case (which is in many respects similar to In re Anderson, supra), and McKeown v. Brown, supra, is apparent.

The trial court was right in holding that the property was subject to the tax demanded by the state treasurer, and its order and judgment must be, and they are,—Affirmed.

LADD, PRESTON, WEAVER, SALINGER, GAYNOR, JJ., concur.