Anderson v. Ritterbusch, *County Treasurer*.

No. 407.   Opinion Filed December 21, 1908.

(98 Pac. 1002.)

1.   STATUTES—"Revenue Laws"—Definition.   "Revenue laws" are those laws only whose principal object is the raising of revenue, and not those under which revenue may incidentally arise.

2.   SAME—Origin in House—"Bill for Raising Revenue." Senate Bill No. 245 (Sess. Laws 1907-08, p. 729, c. 81, art. 9), entitled "An act for the discovery of property not listed for taxation, providing for its assessment and the collection of taxes thereon," is not a "bill for raising revenue," such as must originate in the House of Representatives, under section 33, art. 5 (Bunn's Ed. sec. 106), of the Constitution.

3.   SAME—"Revenue Bills." "Revenue bills" are those that levy taxes in the strict sense of the word, and are not bills for other purposes which may incidentally create revenue.

4.   TAXATION—Omitted Property—Legislation to Recover Taxes. Taxes due the territory of Oklahoma prior to statehood on account of omitted property, constituted a debt accruing to the territory, under section 3 of the Schedule (Bunn's Ed. sec. 452) to the Constitution, and the Legislature of the state may make provisions for the recovery of such taxes by the state.

5.   STATUTES—Uniformity of Operation. Whenever a law of general nature is passed by the Legislature for the whole state, and is not applied by the Legislature to any particular locality therein, and has no words prohibiting its application to any particular locality, it is a "law having uniform operation throughout the state," within the meaning of section 59, art. 5 (Bunn's Ed. sec. 132), of our Constitution, although it may not practically have operation in every part of the state.

6.   TAXATION—Statutory Provisions—Specification of Purpose of Tax. Senate Bill No. 245 (Sess. Laws 1907-08, p. 729, c. 81, art. 9) is purely remedial in its nature. It does not attempt to levy a tax, but only goes to confirm pre-existing rights by providing a means for the collection of taxes upon omitted or escaped property. Such legislation is not repugnant to section 19, art. 10 (Bunn's Ed. sec. 285), of the Constitution, which provides that every act levying a tax shall specify the purpose for which it is levied, and that the tax so levied shall not be devoted to any other purpose.

7. **TAXATION—Constitutional Provisions—Omitted Property—Disposition of Old Taxes.** The fact that the public expenses have been paid for the years in which the taxes were omitted, or that the particular purposes for which they were originally required have been met with other funds, or that the collection of the omitted taxes may temporarily create a surplus of public revenues, presents no constitutional grounds why omitted property should continue to escape its due share of taxation. When collected, these taxes will still belong to the public, and, like any other surplus, be subject to future appropriation, and thereby lessen future taxation upon those who have already paid more than their share.

8. **CONSTITUTIONAL LAW—Vested Rights—Taxation—Omitted Property.** Senate Bill No. 245 (Sess. Laws 1907-08, p. 729, c. 81, art. 9) provides a method by which taxes due on omitted property may be assessed and collected. It gives a new remedy to the state for enforcing a right which it had all the time possessed, namely, the right to taxes upon property liable to taxation. Such legislation invades no vested right of the taxpayer.

9. **STATUTES—Construction—Retrospective Operation.** Where the language plainly shows the legislative intent that the statute should have a retrospective operation, the court will so construe the act as to give it the operation intended.

10. **TAXATION—"Taxing Power"—Scope.** The "taxing power," when acting within its legitimate sphere, is one which knows no stopping place, until it has accomplished the purpose for which it exists, viz., the actual enforcement and collection from every lawful object of taxation of its proportionate share of the public burdens; and, if prevented by any obstacles, it may return again and again until, the way being clear, the tax is collected.

11. **SAME—Constitutional Requirements—Uniformity.** In laws for the assessment and collection of taxes due on omitted property, it is uniformity of burden, and not identity of method of enforcement, which is required by constitutional principles.

12. **SAME—Undervaluation—Re-assessment.** The state has the power through its Legislature if it sees fit, to pass a retrospective law providing for the re-assessment of property grossly undervalued. Hence the owner of omitted property has no right to complain that his property is assessed at its actual cash value, because other property has been assessed heretofore at much less than its real value. The Legislature may at any time require the re-assessment of all such undervalued property. No property owner can refuse to pay his full obligations to the state for taxes merely because some of his neighbors may not yet have paid their full obligation.

13. **LIMITATION OF ACTIONS—Limitation Against State.** The rule that statutes of limitation do not run against the state unless

it is expressly so provided is applicable in actions where the state, though not the real party to the record, is the real party in interest.

14.    CONSTITUTIONAL LAW— Ex Post Facto Laws—Taxation. A law is not ex post facto merely when it is criminal in character, but that doctrine extends to laws which are penal in any form, which provides the imposition of some punitive consequence for its violation, whether it is a fine assessed in criminal prosecution or a sum to be taken forcibly for the violation of any other process prescribed. · That part of Senate Bill No. 245 (Sess. Laws 1907-08, p. 729, c. 81, art. 9) which provides that "all taxes levied under the provisions of this act, shall become payable immediately, and shall be entered upon the tax roll, and shall bear interest and penalties at the same rate as provided by existing laws," in so far as it attempts to operate retrospectively, falls within this class of legislation, and is repugnant to section 15, art. 2 (Bunn's Ed. sec. 24), of the Constitution, which prohibits the enactment of ex post facto laws.

15.    SAME—"Due Process of Law." "Due process of law" does not necessarily include trial by jury, or in certain cases any court trial.

16.    SAME—Judicial Hearing. Due process of law does not always require judicial hearings, except in matters of purely judicial nature, but not in matters of taxation, or matters purely administrative in their nature.

17.    SAME—Taxation—Omitted Property. A law authorizing the assessment and collection of taxes on omitted property, which affords the owner an opportunity to question the validity of it, either before that amount is determined ·or in subsequent proceedings for its collection, does not infringe section 7, art. 2 (Bunn's Ed. sec. 16), of the Constitution, which provides that "No person shall be deprived of life, liberty or property, without due process of law."

18.    TAXATION—Procedure—Right of Appeal. A proceeding for the assessment and collection of taxes on omitted property is not a civil action. It is a remedial proceeding granted by the Legislature, conferring upon the treasurer a remedial right and·duty not heretofore existing, for the assessment and collection of taxes due on omitted property, and as a matter of grace the Legislature gave the taxpayer the right of appeal to the county court, where said summary proceedings may be heard de novo.

19.    CONSTITUTIONAL LAW—Exclusion of Power by Implication. Section 36, art. 5 (Bunn's Ed. sec. 109), of the Constitution, providing that "any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever," was incorporated into the Con-

stitution to exclude the idea of the exclusion of power by implication.

20.    **SAME—Construction in Favor of Validity.** It is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.

(Syllabus by the Court.)

Original petition by George Anderson for a writ of prohibition to be directed to Fred W. Ritterbusch, Treasurer of Logan County. Writ denied.

*C. G. Hornor,* for plaintiff.
*M. Fulton, John Adams,* and *Paul Williams,* for defendant.

KANE, J.    This is an original proceeding praying for a writ of prohibition, commenced by George Anderson, the plaintiff, a taxpayer of Logan county, Okla., against Fred W. Ritterbusch, treasurer of said county. The petition alleges, in substance, that on the 11th day of September, 1908, the defendant served upon the plaintiff a notice in writing, by the terms whereof plaintiff was notified that, unless he filed objections in writing at the county treasurer's office, in said Logan county, on the 21st day of September, 1908, the defendant would immediately proceed to assess taxes against the plaintiff and his property in the sum of $3,408.93 for taxes upon property belonging to plaintiff, alleged to have escaped taxation for the years from 1894 to 1907, inclusive, with a penalty of 50 per cent. added thereto. The petition further states, in substance, that said threatened action of defendant is wrongful and unlawful; that the defendant has no power, authority, or jurisdiction to assess any taxes against plaintiff, or to do any of the acts threatened to be done by him; that the sole and only authority under which the defendant is, and claims to be, acting in the premises is a certain act of the Legislature of Oklahoma, approved by the Governor on May 29, 1908 (Sess. Laws 1907-08, p. 729, c. 81, art. 9). the same being Senate Bill No.

245, entitled "An act for the discovery of property not listed for taxation, providing for its assessment and the collection of taxes thereon," which act is in words and figures as follows:

"Section 1. The board of county commissioners of any county in this state may contract with any person or persons to assist the proper officers of the county in the discovery of property not listed, and assessed as required by existing laws, and fix the compensation not to exceed twenty-five per cent. of the taxes recovered under this act. Before listing and assessing the property discovered, the county treasurer shall give the person in whose name it is proposed to assess the same, ten days' notice thereof by registered letter addressed to him at his last-known place of residence, fixing the time and place when objections in writing to such proposed listing and assessment may be made. An appeal may be taken to the county court from the final action of the treasurer within ten days, by giving notice thereof in writing, and filing an appeal bond as in cases appealed from the board of county commissioners to the district court.

"Sec. 2. Property that has been omitted from assessment through a series of years, shall be listed and assessed for each year that it has been omitted and charged with levy for that year.

"Sec. 3. All taxes levied under the provisions of this act, shall become payable immediately and shall be entered upon the tax roll, and shall bear interest and penalties at the same rate as provided by existing laws, and shall become a lien on the property of the person liable for the payment thereof in the same manner and to the same extent as in the case of taxes levied under existing laws," etc.

The validity of the foregoing act is assailed: (1) Upon the ground that it is an act for raising revenue, originating in the Senate, and therefore in conflict with article 5, § 33 (Bunn's Ed. § 106), of the Constitution, which provides that all bills for raising revenue shall originate in the House. (2) That it is in conflict with article 5, § 33, of the Constitution, which provides that no revenue bills shall be passed during the last five days of the session of the Legislature. (3) That it is in conflict with article 5, § 59 (Bunn's Ed. § 132), of the Constitution, which requires that all laws of a general nature shall have uniform opera-

tion throughout the state. (4) That if applied retrospectively, it aims and attempts to raise revenue in violation of article 10, § 19 (Bunn's Ed. § 285), of the Constitution, which provides that no tax levied and collected for any purpose shall ever be devoted to another purpose.

In this connection plaintiff avers that the taxes proposed to be levied and collected under the said proceedings are for various, special, and general purposes, which under changed conditions can never be made available. That a large part of said proposed tax is for the support of institutions formerly existing under a territorial form of government, but which are either no longer in existence, or are supported by another mode of taxation, or for the payment of salaries and fees of former territorial officials who are no longer in office, and who have heretofore been fully paid, so that taxes levied for said purpose, as proposed in said notice, could not legally be used for any purpose now, if the same were collected. That, generally speaking, the obligations for which said taxes were levied have been paid and satisfied out of taxes heretofore levied, and there is now no available purpose for which said taxes could now be collected, and the purposes for which they are proposed to be collected are invalid under said section of the Constitution last quoted; that, there being no purpose at this time for which said taxes could be levied or collected, the levy and collection of the same are necessarily invalid, under said provision of the Constitution. (5) That even if the law was valid, it could only operate prospectively. (6) That by existing laws the assessment of property for taxation, the levying of taxes, and the collection of the same is provided for; that there is no provision of law by which the county treasurer is authorized to assess property or levy taxes; that these powers and duties are distributed among other officials, provided for by law, and whose duties are defined. Under existing laws there is no authority conferred upon the county treasurer to do any of the acts which he threatens to do herein. (7) That during all the years for which it is proposed to levy and collect taxes

herein other personal property than that mentioned in the notice hereto attached has been assessed at about one-fourth of its value. If property of the kind herein referred to were to be assessed at 100 cents on the dollar, that it would be four times as much as other like property owned in said county has been charged with, and the owner of such property would thus be compelled to bear an unequal and disproportionate share of the taxes. (8) That by reason of the pecuniary interest of the persons involved in the attempted assessment and collection of said taxes the county treasurer is disqualified to sit in judgment upon any of the matters and things involved in said proceeding before him. (9) That if taxes could be assessed, levied, and collected as proposed in said proceeding, plaintiff would be denied the equal protection of the laws, and would be deprived of his property without due process of law.

Then follows an allegation to the effect that, on the 21st day of September, 1908, at the time fixed in said notice, the plaintiff went before the county treasurer, and filed objection to said proceedings, and requested the defendant to desist from said proceedings, and to discharge plaintiff therefrom, but said county treasurer wrongfully overruled plaintiff's motion and pleas, and is now proceeding, and will proceed, to do the acts mentioned in said notice, unless prohibited by this court. To the petition of the plaintiff the defendant filed a general demurrer, and the cause was submitted to the court upon the issues thus joined. We will examine the questions raised in the order hereinbefore set out.

Section 33, art. 5, of the Constitution, provides that:

"All bills for raising revenue shall originate in the House of Representatives. The Senate may propose amendments to revenue bills. No revenue bill shall be passed during the last five days of the session."

It is obvious that the phrases "bills for raising revenue" and "revenue bills" are used in the same sense in the above section, and that the injunctions "All bills for raising revenue shall originate in the House of Representatives" and "No revenue bill shall be

passed during the last five days of the session" are leveled at the same class of legislation. It follows, then, that the first two questions raised by counsel must stand or fall together. Judge Story, in his work on the Constitution (volume 1, c. 13), learnedly discusses the history of the clause "All bills for raising revenue shall originate in the House of Representatives," and says that:

"This provision, so far as it regards the right to originate what are technically called 'money bills,' is, beyond all question, borrowed from the British House of Commons, of which it is the ancient and indisputable right and privilege that all grants of subsidies and parliamentary aids shall begin in their House, and are first bestowed by them, although their grants are not effectual to all intents and purposes until they have the assent of the other two branches of the Legislature." (1 Black. Comm. 169.)

After further discussion of the necessity and benefit of such a provision under the British Constitution, Judge Story continues:

"It will be at once perceived that the same reasons do not exist in the same extent for the same exclusive right in our House of Representatives, in regard to money bills, as exist for such right in the British House of Commons. It may be fit that it should possess the exclusive right to originate money bills, since it may be presumed to possess more ample means of local information, and it more directly represents the opinions, feelings, and wishes of the people; and being directly dependent upon them for support, it will be more watchful and cautious in the imposition of taxes than a body which emanates exclusively from the states in their sovereign political capacity. But as the senators are in a just sense equally representatives of the people, and do not hold their offices by a permanent or hereditary title, but periodically return to the common people, and above all, as direct taxes are and must be apportioned among the states according to their federal population, and as all the states have a distinct local interest, both as to the amount and nature of all taxes of every sort which are to be levied, there seems a peculiar fitness in giving to the Senate a power to alter and amend, as well as concur with or reject, all money bills. The due influence of all the states is thus preserved, for otherwise it might happen, from the overwhelming representation of some of the larger states, that taxes might be levied which would bear with peculiar severity

upon the interest, either agricultural, commercial, or manufacturing, of others, being the minor states, and thus the equilibrium intended by the Constitution, as well of power as of interest and influence, might be practically subverted."

In relation to the importance of such a provision in state Constitutions, Judge Story says:

"Indeed of so little importance has the exclusive possession of such a power been thought in the state government, that some of the state Constitutions make no difference as to the power of each branch of the Legislature to originate money bills. Most of them contain a provision similar to that in the Constitution of the United States; and, in these states where the exclusive power formerly existed, as, for instance, in Virginia and South Carolina, it was a constant source of difficulties and contentions. In the revised Constitution of South Carolina (in 1790) the provision was altered so as to conform to the clause in the Constitution of the United States."

After a further discussion of the origin, history, and advantages of such a clause Judge Story concludes:

"What bills are properly called 'bills for raising revenue,' in the sense of the Constitution, has been a matter of discussion. A learned commentator supposes that every bill which indirectly or consequently may raise revenue is, within the sense of the Constitution, a revenue bill. He, therefore, thinks that the bills for establishing the post office and the mint and regulating the value of foreign coin belong to this class, and ought not to have originated (as in fact they did) in the Senate. But the practical construction of the Constitution has been against his opinion. And indeed the history of the origin of the power already suggested abundantly proves that it has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes which may incidentally create revenue."

The learned commentator referred to by Judge Story was Mr. St. George Tucker, author of Tucker's Black. Comm. Mr. John Randolph Tucker, in his work on the Constitution (1 Tucker on the Constitution, § 212), says of the same author:

"It was suggested by an early and able commentator that the

term 'to raise revenue' included post office bills, mint bills, and bills in reference to the sale of public lands. This seems to be a misconception, for such bills do not impose a burden on taxpayers; and this clause historically, and as applied in the English practice, only related to revenue raised by taxation, and was intended to protect taxpayers."

From an examination of the authorities cited by counsel in their respective briefs it seems clear that the American decisions, both state and federal, have followed Judge Story, and have uniformly refused to hold a bill void because it originated in the Senate, unless the bill levied or imposed a tax in the strict sense of the word. District Judge McDonald, in the case of *The Nashville,* 17 Fed. Cas. 1176 (No. 10,023), says: "The revenue laws are those laws only whose principal object is the raising of revenue, and not those under which revenue may incidentally arise." In the course of his opinion the learned Judge further says:

"Indeed the history of the origin of the power (to raise revenue) already suggested, abundantly proves that it has been confined to bills to levy taxes in the strict sense of the word, and has not been understood to extend to bills for other purposes which may incidentally create revenue."

In the case of *United States v. James,* 13 Blatchf. 207. Fed. Cas. No. 15,464, Circuit Judge Johnson, who wrote the opinion of the court, says:

"Certain legislative measures are unmistakably bills for raising revenue. These impose taxes upon the people, either directly or indirectly, or lay duties, imposts, or excises for the use of the government."

In the case of *United States v. Mayo,* 26 Fed. Cas. 1230 (No. 15,754), Judge Story, who delivered the opinion, uses the following language:

"The true meaning of revenue laws in this clause is such laws as are made for the direct and avowed purpose of creating and securing revenue or public funds for the service of the government. No laws, whose collateral or indirect operation might possibly conduce to the public or fiscal wealth, are within the scope of the provision."

A case frequently cited in the question now under discussion is *Perry County et al. v. Selma, etc., Railway Company*, 58 Ala. 546. Counsel for both sides cite it as supporting their contention in the case at bar. The act, complained of in the Alabama case, attempting to levy a state tax of ¾ of 1 per cent. on railway property, originated in the Senate, and the court held that it was null and void for that reason. The effect of the provision was to actually lower the rate of taxation of the state, but the court held nevertheless that, because it levied a tax, it was a bill for raising revenue. Mr. Justice Stone, who wrote the opinion of the court, defines the language "to raise revenue" as follows:

"It is clear to our minds that 'increase of revenue' is not implied in the language 'to raise revenue.' The transitive verb 'to raise' in this connection means 'to bring together; to collect; to levy; to get together for use or service, as to raise money. * * *' (Webster's Dictionary.) The precise meaning of this clause is to levy a tax as a means of collecting revenue. See *Harper v. Commissioners of Elberton*, 23 Ga. 566. The act in question in one sense reduced the taxes, for it assumed to relieve certain railroad property from county taxation. But it was nevertheless a bill to raise revenue. It assumed to repeal section 24, Revenue Laws 1868 (Pamph. Acts 1868, p. 307) ; levied a tax for state purposes on the right of way, roadbed, * * * of all railroads in this state."

The Alabama court obviously followed Judge Story's definition of the phrase "to raise revenue," and decided the question on the ground that the law was one that levied a tax for state purposes, in which position we think the court was clearly right. But it seems to us the case at bar does not fall within that class of cases. We have a complete revenue law for the purpose of raising money to defray the expenses of state, county, and municipal government, and one that would apportion the burdens of government justly and equally among the taxpayers if all property owners complied with its provisions. Unfortunately this is not the case, and the Legislature found it necessary to provide a means for reaching property which, through fraud or other means, was omit-

ted from taxation, whereby such property and the owners thereof would be required to pay their just share of the burdens of government. To our minds such a law is in no sense a bill for raising revenue, although it may incidentally have that effect. It does not belong to that class of revenue bills mentioned by Judge Story as those that levy taxes in the strict sense of the word.

Mr. Justice Harlan, in *Twin City National Bank v. Nebeker,* 167 U. S. 196, 17 Sup. Ct. 766, 42 L. Ed. 134, approves the position of Judge Story in the following language:

"Mr. Justice Story has well said that the practical construction of the Constitution, and the history of the origin of the constitutional provision in question, proves that revenue bills are those that levy taxes in the strict sense of the word, and are not bills for other purposes which may incidentally create revenue."

The last case in the United States Supreme Court touching the subject under discussion was the case of *Millard v. Roberts,* 202 U. S. 429, 26 Sup. Ct. 674, 50 L. Ed. 1090. This case follows the case of *Twin City National Bank v. Nebeker, supra,* and again cites Judge Story with approval. Senate Bill No. 245 makes no levy nor lays nor imposes any tax. · As its title shows, it is "An act for the discovery of property not listed for taxation, providing for its assessment and the collection of taxes thereon."

The foregoing cases seem to support the contention of counsel for the defendant. The following cases are more or less in point to the same effect: *Fletcher v. Oliver,* 25 Ark. 289; *Commonwealth v. Bailey,* 81 Ky. 395; *Geer v. Commissioners,* 97 Fed. 435, 38 C. C. A. 250; *Opinion of Justices,* 70 N. H. 640, 50 Atl. 329; *Opinion of Justices,* 126 Mass. 557; *Northern Counties Inv. Trust v. Sears,* 30 Or. 388, 41 Pac. 931, 35 L. R. A. 188; *Thierman Co. v. Commonwealth* (Ky.) 97 S. W. 366; *Raymond et al v. Kibbe et al.* (Tex. Civ. App.) 95 S. W. 727; *State v. Wright et al.,* 14 Or. 365, 12 Pac. 708; *Kennamer v. State,* 150 Ala. 74, 43 South. 482; *Dunbar v. Frazer,* 78 Ala. 538; *Geib v. State,* 31 Tex. Cr. R. 514, 21 S. W. 190; *Day Land Co. v. State,* 68 Tex. 526, 4 S. W. 865; *Sheppard v. Dowling,* 127 Ala. 1, 28 South. 791,

85 Am. St. Rep. 68; *Succession of Givanovich,*, 50 La. Ann. 625, 24 South. 679; *Succession of Sala,* 50 La. Ann. 1009, 24 South. 674; *Mumford v. Sewall,* 11 Or. 67, 4 Pac. 585, 50 Am. Rep. 462; *Crawford v. Linn. Co.,* 11 Or. 482, 5 Pac. 738; *U. S. v. Hill,* 123 U. S. 681, 8 Sup. Ct. 308, 31 L. Ed. 275; *U. S. v. Broadhead,* 127 U. S. 212, 8 Sup. Ct. 1191, 32 L. Ed. 147.

The next contention of counsel for plaintiff is to the effect that it is impossible for said act to have uniform operation throughout the state, if applied retrospectively, for the reason that no taxes have heretofore been levied in that part of the state heretofore known as Indian Territory, and therefore said act can have no operation in that part of the state, and if said revenue should be applied in support of the state institutions, it would fall wholly on that part of the state heretofore known as Oklahoma, without any part thereof falling on the eastern part of the state, heretofore known as Indian Territory. We believe this position is untenable. When the two territories were erected into one state, the state assumed all of the debts of the territory of Oklahoma, and succeeded to all its rights. Section 3, par. 4, Enabling Act (Act June 16, 1906, c. 3335, 34 Stat. 270), provides: "That the debts and liabilities of said territory of Oklahoma shall be assumed and paid by the state." Section 1 of the Schedule (Bunn's Ed. § 450) provides that:

"No existing rights, actions, suits, proceedings, contracts or other claims shall be affected by the change in the forms of government, but all shall continue as if no change in the forms of government had taken place."

Section 3 of the Schedule (Bunn's Ed. § 452) provides that:

"All debts, fines, penalties, and forfeitures which have accrued or may hereafter accrue to the territory of Oklahoma shall inure to the state of Oklahoma, and may be sued for and recovered by the state."

It is significant that the Enabling Act provides that the debts and liabilities of the territory of Oklahoma should be assumed by the state, and no mention made of the debts of the Indian Terri-

tory, because there were none. Neither did the sections of the Schedule above quoted give the right to the state to collect any debts, fines, penalties, or forfeitures owing to the Indian Territory, because there were none, but the Schedule does give the right to the state to enforce any existing rights, actions, suits, proceedings, contracts, or claims, debts, fines, penalties, and forfeitures owing to the territory of Oklahoma. The indebtedness of the territory of Oklahoma at the time of the admission of the state was approximately $700,000. This debt was contracted, and the money used, for the benefit of that part of the state formerly known as Oklahoma Territory. This debt is assumed by the state. The people of the Indian Territory side of the state received none of the benefits of the money expended and represented by this debt. It is possible, indeed it is probable, that had the class of persons whom Senate Bill No. 245 was intended to reach listed their property under the law in force in Oklahoma Territory, there would have been no indebtedness on the Oklahoma side of the state and both territories would have come into the Union on an equal footing so far as taxation was concerned. It is the universal rule that the burdens of taxation must be distributed according to the benefit derived, and this is so whether a tax is gathered for future benefit or for a benefit already received. It would have been unjust to the Oklahoma side of the state to have been compelled to pay state taxes for the year 1907, when no levy for state purposes for that year was made on the Indian Territory side of the state, because the entire state would have reaped the benefit of such taxes. Accordingly the Legislature, by an act approved on the 11th day of January, 1908, remitted all state taxes for the year 1907. But to do an equal equity to the Indian Territory side of the state, the Legislature, by the act now in question, provided that the state might collect the taxes which should have been collected by the Oklahoma Territory for the years prior to 1907 on property negligently or fraudulently omitted from the tax list. By permitting this law to operate prior to the year 1907, those

who, by one means or another, escaped the payment of taxes on the Oklahoma side will be compelled to pay a debt to the state that they formerly owed to the territory of Oklahoma, and will thus help to pay the Oklahoma Territory debt, assumed by the state under the Enabling Act.

It is not the purpose of this act to tax any of the people on the Oklahoma side of the state. It merely provides the state with a procedure whereby, through its proper ·officers, it may enforce rights existing in favor of the territory of Oklahoma at the time the two territories were erected into a state, on account of taxes which should have been paid on omitted property. That such taxes constitute a claim, debt, or liability owing to the state has been frequently decided by the courts. In *Sturges v. Carter,* 114 U. S. 511, 5 Sup. Ct. 1014, 29 L. Ed. 240, it is held that:

"The act of the Legislature of Ohio of April 11, 1878 (75 Ohio Laws, p. 456), providing for the correction of the returns of property for taxation previously made, is not retroactive under section 28, art. 2, of the Constitution of that state. It merely gave the state a new remedy for existing rights."

The Supreme Court of Indiana, in *Graham v. Russell,* 152 Ind. 186, 52 N. E. 806, held that the right of the state, through its proper officers, to collect taxes on property omitted from the tax lists is a continuing right, and is not terminated by the death of the property owner; the right surviving in the favor of the state against the heirs, devisees, and personal representatives of the deceased. To the same effect are *Reynolds v. Bowen,* 138 Ind. 434, 36 N. E. 756, 37 N. E. 962; *Buck et al. v. Miller,* 147 Ind. 586, 45 N. E. 647, 47 N. E. 8, 37 L. R A. 384, 62 Am. St. Rep. 436; *Redwood County v. Winona & St. Peter Land Co.,* 40 Minn. 512, 41 N. W. 465, 42 N. W. 473. There seems to be no conflict between the courts of the states upon this question. They all uphold the power of the Legislature to provide remedial procedure for the collection of taxes on property omitted from the tax lists prior to the current year, and hold that the duty of the property owner

to pay such taxes to the state is a right, liability, or debt in the broad sense of the term, which the state can enforce.

Adopting this construction, it follows that, under the terms of the Enabling Act and Schedule to the Constitution hereinbefore set out, the state of Oklahoma is not without authority to enforce, by appropriate legislation, the collection of taxes that were due to the territory of Oklahoma upon the admission of the state into the Union. *Commonwealth v. Sweigart's Adm'r*, 115 Ky. 293, 73 S. W. 758; *Brunson v. Starbuck*, 32 Ind. App. 457, 70 N. E. 163; *Buck v. Beach*, 164 Ind. 37-58, 71 N. E. 963, 108 Am. St. Rep. 272. Moreover the courts have uniformly held that, whenever a law of a general nature is passed by the Legislature for the whole state, and is not applied by the Legislature to any particular locality thereof, and has no words prohibiting its operation in any particular locality, it is a law having a uniform operation throughout the state, within the meaning of the constitutional provisions similar to section 59, art. 5, of our Constitution, although it may not practically have operation in every part of the state. Section 59, art. 5, *supra,* reads as follows:

"Laws of a general nature shall have a uniform operation throughout the state, and where a general law can be made applicable, no special law shall be enacted."

Section 17, art. 2, of the Kansas Constitution reads:

"All laws of a general nature shall have a uniform operation throughout the state; and in all cases where a general law can be made applicable, no special law shall be enacted."

In *Noffzigger v. McAllister,* 12 Kan. 315, the question before the court was the validity of a law providing that the board of county commissioners of any county may, upon petition of a majority of the qualified electors of any township, make an order that all persons owning domestic animals of any kind shall keep them confined during the night time, etc. It was claimed that this act was repugnant to the above section of the Kansas Constitution. Mr. Justice Valentine, who wrote the opinion of the court, in discussing the proposition says:

"Neither is this act in contravention of section 17 of article 2 of the Constitution. It was enacted for the whole state, and for every part thereof. Any township in the state may come within the provisions of article 1 of the act or any township may remain out. In this respect the act resembles many other acts which depend for their practical operation upon the discretion of the county board, or the people, or the happening of certain contingencies. * * * Whenever a law of a general nature is passed by the Legislature for the whole state, and is not applied by the Legislature to any particular locality thereof, and has no words prohibiting its operation in any particular locality thereof, it is a law having a uniform operation throughout the state, within the meaning of said constitutional provision, although it may not practically have operation in every part of the state."

Other Kansas cases in point are *Leavenworth Co. v. Miller*, 7 Kan. 479, 12 Am. Rep. 425; *Board of Comms. v. Shoemaker*, 27 Kan. 77; *Francis v. A., T. & S. F. R. R. Co.*, 19 Kan. 303.

In *Groesch v. State*, 42 Ind. 547, it is held that:

"The Constitution does not require that the operation of laws throughout the state shall be uniform, in any other sense than that their operation shall be the same in all parts of the state under the same circumstances and conditions."

To the same effect are *People v. Wright*, 70 Ill. 388, and *Bucklew v. Ry. Co.*, 64 Iowa, 603, 21 N. W. 103.

It has been held that:

"A law framed in general terms, restricted to no locality, and operating equally upon all of a group of objects, which, having regard to the purpose of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves, is not a special or local law, but a general law." (*State v. Parsons et al.*, 40 N. J. Law, 123; *State v. Essex Co.*, 45 N. J. Law, 504.)

The language of Senate Bill No. 245 is general in its scope; and, while it is true, giving it a restrospective construction, it may not affect the Indian Territory side of the state to the same extent that it will the Oklahoma Territory side, on account of the difference in conditions prevailing prior to statehood, yet the same

may be said of most any other law. As was said by Mr. Justice Valentine, in the case of *Commissioners v. Miller, supra:*

"Scarcely any of our laws have had any actual or practical operation out in the Buffalo region, and yet it will hardly be contended that they are unconstitutional for that reason."

We think this reflection of Judge Valentine has peculiar application to the state of Oklahoma, which is composed of the territories of Oklahoma and Indian Territory, where prior to statehood there was such marked dissimilarity in governmental and industrial conditions.

The next contention urged by counsel for plaintiff is that the act is in conflict with section 19, art. 10, of the Constitution, which provides that every act levying a tax shall specify the purpose for which said tax is levied, and that the tax so levied shall not be devoted to any other purpose. The same question was before the Supreme Court of Minnesota in *County* of *Redwood v. Winona & St. Peter Land Company,* 40 Minn. 512, 41 N. W. 465, 42 N. W. 473, where Mr. Justice Mitchell, who delivered the opinion of the court, answers these objections in the following language:

"The burden of appellant's argument in support of the first proposition seems to be that the Legislature has no power to authorize a tax for past years upon property theretofore omitted, when all the purposes of taxation for such years have been fully subserved; that taxes can only be levied to defray the expenses of the state and local government, and that, if these back taxes are levied and collected, there is now no object to which they could be applied; that they would be a mere idle surplus in the treasury; that the fact that in past years lands have been omitted cannot be made the basis of present taxation. The grand fallacy in this argument is in assuming that statutes like the one under consideration are acts authorizing original taxation. The tax was a debt or liability which the land owed in the year when it ought to have been assessed. Such statutes are purely remedial in their nature, and only go to confirm pre-existing rights by adding to the means of enforcing existing obligations. And it can hardly be necessary at this day to argue that, wherever property has escaped payment of its share of the public burdens, it is competent for the Legis-

lature to provide for its assessment, or reassessment for back years, and for that purpose it may adopt any method which it might have originally adopted for the enforcement of the collection of taxes. There is no difference in principle between a case where property has escaped taxation by reason of its entire omission from the assessment rolls and a case where it has escaped by reason of defects in attempted proceedings for the enforcement of the tax. In either case the debt or liability for its share of the public burdens remains, and it may be ascertained and enforced in any subsequent year; and the owner cannot object to any particular method adopted for that purpose, provided it operates equally and justly. The principle of all the cases is that the taxing power, when acting within its legitimate sphere, is one which knows no stopping place until it has accomplished the purpose for which it exists, viz., the actual enforcement and collection from every lawful object of taxation of its proportionate share of the public burdens; and if prevented by an obstacle, it may return again and again until, the way being clear, the tax is collected.

"This right to assess or reassess for back taxes, under appropriate legislation, has been fully recognized by this court in *County of Olmstead v. Barber*, 31 Minn. 256, 17 N. W. 473, 944, and *County of Ramsey v. Chicago, Mil. & St. Paul Ry. Co.*, 33 Minn. 537, 24 N. W. 313. It is laid down as the unquestioned law by every text-writer. Cooley, Tax'n, § 309; Welty, Assessm. § 197; Blackw. Tax Titles, §§ 325, 951; Burrough's Tax'n, § 93; 2 Dill. Mun. Corp. 814. It is supported by an unbroken line of decisions, not only in cases where an abortive attempt to enforce the tax had been previously made, but also in cases where it had been assessed against the wrong person, or where as in this case, property had entirely escaped assessment. *Fairfield v. People*, 94 Ill. 244; *People v. Board of Assessors*, 92 N. Y. 430; *City of Wheeling v. Hawley*, 18 W. Va. 472; *Harwood v. North Brookfield*, 130 Mass. 561; *Hubbard v. Garfield*, 102 Mass. 72; *Byra v. Detroit*, 50 Mich. 56, 12 N. W. 912, 14 N. W. 698; *Overing v. Foote*, 43 N. Y. 290; *North Carolina R. Co. v. Commissioners*, 82 N. C. 259; *Mills v. Charleton*, 29 Wis. 400, 9 Am. Rep. 578.

"The fact that the public expenses have been paid for the years in which the taxes were omitted, or that the particular public purposes for which they were originally required have been met with other funds, or that the collection of the omitted taxes may temporarily create a surplus of public revenue, presents no consti-

tutional ground why omitted property should continue to escape its due share of taxation. When collected, these taxes will still belong to the public, and, like any other surplus, be subject to future appropriation, and thereby lessen future taxation upon those who have already paid more than their share. *Village of Hyde Park v. Ingalls,* 87 Ill. 11; *Fairfield v. People, supra.*"

The above case in many of its aspects is similar to the case at bar, and has application to other points raised by counsel for plaintiff, as well as to the specific point it is cited to sustain. Other authorities in point are: *Cleveland, C. C. & St. L. Ry. Co. v. People,* 208 Ill. 9, 69 N. E. 832; *People v. Ry. Co.,* 216 Ill. 221, 74 N. E. 734; *Lawrence v. Traner,* 136 Ill. 474, 27 N. E. 197; *Union Pac. R. R. v. County of Dawson,* 12 Neb. 254, 11 N. W. 307; Desty on Taxation, 648.

The act provides that the board of county commissioners may contract with any person, or persons, to assist the proper officers in discovering said property and listing and assessing and fixing the compensation, not to exceed 25 per cent. of the taxes recovered under this act. Counsel for plaintiff insists that this would be diverting a part of the tax from its original purpose, and therefore unconstitutional. This question has been before the Supreme Court of Ohio in *State ex. rel. Morgenthaler v. Crites, Auditor,* 48 Ohio St. 142, 26 N. E. 1052. Article 12, § 5, of the Ohio Constitution, provides that:

"No tax shall be levied except in pursuance of law; and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied."

This section is substantially the same in import as our section 19, art. 10, *supra.* The Ohio law provided for the employment by contract of tax inquisitors by the board of supervisors, and directed that they should be paid a sum not to exceed 20 per cent. out of the taxes recovered by virtue of their efforts. Morgenthaler had a contract as tax inquisitor, and had listed, or caused to be listed, omitted property belonging to one Calvin S. Brice for five successive years, ranging in amounts of about $2,000,000 for each year. The defendant, Crites, county auditor,

refused to assess the property and enter it on the tax rolls, and the tax inquisitor brought mandamus proceedings against him to compel him to perform his duty and assess the property. On the part of the defendant it was contended, among other defenses, that the Ohio law, providing for the payment to the tax inquisitor 20 per cent. of the taxes recovered, was a diversion of that much of the taxes from their original object, contrary to the foregoing section of the Ohio Constitution. In deciding against this contention, Mr. Justice Bradbury, who delivered the opinion of the court, says:

"This contract is claimed to divert the public funds from their proper objects, and is therefore illegal. This claim is not well founded. The contract violates no statute of the state. On the contrary, it is a contract expressly authorized by an act of the Legislature (85 Ohio Laws, p. 170), passed April 10, 1888, 'To secure fuller and better returns of property for taxation. * * *' Nor is it a diversion of the public funds, but is rather a mode of compensating services actually performed for the public; and, to quicken the energies of the servant, this compensation is made to depend on the efficiency of his services. To hold that the Constitution prohibits the Legislature to authorize the officers of the state or county to employ persons to assist in adding to the tax duplicate property unlawfully omitted therefrom is entirely too narrow a construction of that instrument. The statute (85 Ohio Laws. p. 170) must be regarded as part of the general plan by which the constitutional rule that all property subject to taxation is to be equally taxed may be enforced, and therefore all contracts made in accordance with its provisions legal and valid."

The foregoing case seems to fully cover this branch of the subject; and as we are convinced that the reasoning therein is sound, we are constrained to follow it.

The language of the act is clearly retroactive. It declares that:

"Property that has been omitted from assessment through a series of years, shall be listed and assessed for each year that it has been omitted and charged with the levy of that year."

This language is almost identical with the Iowa act upon the

same subject. The Supreme Court of Iowa has many times construed that act, and held that it applied to years prior to its passage. The case of *Sturges v. Carter*, 114 U. S. 511, 5 Sup. Ct. 1014, 29 L. Ed. 240, is clearly in point on this proposition. This case went up from the state of Ohio. It was sought to tax Sturges on personal property omitted from taxation for the years 1874 to 1877, inclusive. Sturges contended that the Ohio law, given a retrospective effect, would be in conflict with the section of the Ohio Constitution, which provided that the General Assembly shall not have power to pass retroactive laws. Mr. Justice Woods, who delivered the opinion of the court, held that the act should have a retrospective operation, and that to give it such effect would not violate the Ohio Constitution, because the act was a remedial law, and did not destroy or take away or impair vested rights, nor create new obligations, in respect to transactions or considerations already passed. In the course of the opinion Justice Woods says:

"In substance this contention is that a taxpayer, who has been evading the payment of the taxes due from him by making false returns, can shield himself behind the annual settlement made by the auditor with the treasurer, in which his returns were assumed to be true, and that the Legislature can pass no act by which the falsity of the returns can for a limited period (in this case four years) be exposed, and the payment of the taxes enforced. In other words, that the taxpayer has a vested right in the fruits of his false returns. Such a proposition cannot be sustained. In our opinion no right of the taxpayer was invaded by the act of 1878. His investments in bonds and stocks were subject to taxation. The taxes upon such investments were due to the state, and the act of 1878 merely provided a method by which the taxes might be assessed and collected in spite of the annual settlements made by the auditor. It gave a new remedy to the state for enforcing a right which it had all the time possessed, namely, the right to taxes upon property liable to taxation."

*Sturges v. Carter, supra,* has been cited and followed in many cases, among them being *Lambe v. McCormick*, 116 Iowa, 169-175, 89 N. W. 241; *Bacon v. Comms.*, 126 Mich. 22-27, 85 N. W. 307, 60 L. R. A. 321, 86 Am. St. Rep. 524; *State v. Pors,* 107 Wis.

420-425, 83 N. W. 706, 51 L. R. A. 917; *Reynolds v. Bowen,* 138 Ind. 434-445, 36 N. E. 756, 37 N. E. 962, and *Gager v. Prout et al.,* 48 Ohio St. 89-107, 26 N. E. 1013.

Counsel for plaintiff to sustain his next proposition insists that there is a rule of constitutional law that the same class of property must be assessed and taxed in the same manner and by the same method, and, invoking this rule denies the authority or right of the treasurer to list and assess property under the act in question. He does not specifically point out the section or clause in our Constitution contravened in that particular, but cites *Revenue Agent v. Tonella,* 70 Miss. 701, 14 South. 17, 22 L. R. A. 346, which holds that it is not competent for the Legislature to introduce as to omitted property a procedure for assessment and enforcement of taxes distinct from, and independent of, the original procedure provided by the general statute regarding taxation. The Mississippi act provided a state revenue agent, giving him authority, without notice to the property owner, not only to list and assess property entirely omitted from the tax lists, but also authority to raise the valuation of property already assessed. The Supreme Court of Mississippi held the act void, giving various reasons, but the principal ground upon which the opinion was based seems to be (1) that the act gave the revenue agent the right to make the assessment or to raise the assessment without notice to the property owner; and (2) that the duty of assessment, under the Mississippi Constitution, belonged to a county rather than a state officer. Immediately after the foregoing decision the Legislature of Missisippi passed a law whch cured the defects of the old law, giving the right to assess the property to the county assessor and the county tax collector, and required 10 days' notice to the property owner and gave the right of appeal. Section 4740, Miss. Code 1906. This later law has been upheld by the Supreme Court of Mississippi. *Adams, Revenue Agent, v. Clarke,* 80 Miss. 134, 31 South, 216. It seems to us there is a closer analogy between our act and the later Mississippi law than the old one. There is this,

difference between our Constitution and the Mississippi Constitution: The Mississippi Constitution created the office of assessor, who was a county officer with well-known and defined duties, whereas our Constitution left the revenue laws of the territory of Oklahoma intact so far as they were not in conflict with it, or locally inapplicable. The territorial law provides for the assessment of property omitted from the tax lists, by various officers. Our Constitution does not attempt to change any of the territorial provisions in regard to the assessment of property omitted from the tax list. The right of the Legislature to at any time change or add to the list of county officers is granted by section 2, art. 17 (Bunn's Ed. § 324), of the Constitution.

The following cases uphold the law for the assessment of property omitted from the tax list: *County of Redwood v. Winona & St. Peter Land Co.,* 40 Minn. 512, 41 N. W. 465, 42 N. W. 473; *Olmsted County v. Barber,* 31 Minn. 256, 17 N. W. 473, 944; *Ramsey Co. v. Ry. Co.,* 33 Minn. 537, 24 N. W. 313; *People v. Board,* 92 N. Y. 430; *City of Wheeling v. Hawley,* 18 W. Va. 472; *Harwood v. N. Brookfield,* 130 Mass. 561; *Hubbard v. Garfield,* 102 Mass. 72; *Byram v. City of Detroit,* 50 Mich. 56, 12 N. W. 912, 14 N. W. 698; *Overing v. Foote,* 43 N. Y. 290; *Mills v. Charleton et al.,* 29 Wis. 400, 9 Am. Rep. 578.

As was said by Mr. Justice McClain in *Galusha v. Wendt,* 114 Iowa, 597, 87 N. W. 512:

"It is uniformity of burden, and not identity of method of enforcement, which is required by constitutional principles."

The next contention of counsel for plaintiff is that the act in question is in conflict with the Organic Act and the clause of the Constitution to the effect that there shall be no unequal discrimination in taxing property, but that all property shall be taxed in proportion to its value. They argue that all property is now assessed at its full value, whereas it was the rule in previous years to assess it at about one-third or one-fourth of its value, so that we have a new standard of proportion. which taken as a basis in

this case would require the plaintiff to pay three or four times as much tax as was formerly required. To our mind this is no reason why the law should be held to be invalid. It is yet in the power of the Legislature to require a reassessment of all property which has heretofore been undervalued, and require taxes to be paid thereon at its true value, as the old law required. The Supreme Court of the territory of Oklahoma never recognized any other basis for taxation and has repeatedly held that:

"Where a party seeks to enjoin the collection of a tax which he claims is excessive and illegal, arising from either the action of the assessor or the board of equalization in raising the returned value thereof, it is not only necessary to allege in the petition, but it must be proved upon the trial, that the property was listed and returned for assessment at its true cash value, before a court of equity will interfere and enjoin the collection of the tax claimed to be excessive and void."

*Alva State Bank v. Renfrew,* 10 Okla. 26, 62 Pac. 285; *Shawnee Hdw. Co. v. Durham,* 10 Okla. 361, 61 Pac. 1096; *Wallace et al. v. Bullen et al.,* 6 Okla. 17, 52 Pac. 954; *Lee et al. v. Mehew et al.,* 8 Okla. 136, 56 Pac. 1046.

It has been held in a long line of well considered cases that the state has the power, through its Legislature, if it sees fit, to pass retroactive laws providing for the reassessment of property grossly undervalued. Hence the owner of omitted property has no right to complain that his property is assessed at its actual cash value because other property has been assessed heretofore at much less than its real value. The Legislature may at any time require the reassessment of all such undervalued property. No property owner can refuse to pay his full obligations to the state for taxes merely because some of his neighbors may not yet have paid their full obligation. Some future Legislature may require all such to discharge their full duty. *State v. Bank,* 32 La. Ann. 1136; *Harwood v. N. Brookfield,* 130 Mass. 561; *State v. Weyerhaeuser et al.,* 68 Minn. 353, 71 N. W. 265; Id., 72 Minn. 519, 75 N. W. 718. This last case on appeal is reported in *Weyerhaeuser v. State of Minne-*

Vol. 22—50

*sota,* 176 U. S. 550, 20 Sup. Ct. 485, 44 L. Ed. 583, where the judgment of the court below is affirmed.

The next contention of plaintiff is that the collection of these taxes is barred by the statutes of limitation. To this the defendant answers that limitations do not run against the state; that the right to enforce the collection of taxes will not be barred by the efflux of time, unless the statutes expressly so provide. Counsel for plaintiff contends that to this claim there are two satisfactory replies: First, that under the Oklahoma statutes the county treasurer is the collecting officer, and it is in his own name and office, and not as the state or its representative; that in so far as he acts in the interests of those entitled to the taxes he acts to the extent of nearly all of the tax, in behalf of the county, city, or school district who get the bulk of the taxes; second, the state in no sense has succeeded to the taxes which should have been assessed, levied, and collected by the territory with any better right to enforce the payment than the territory and its officers had. It is not denied that the maxim, *"Nullum tempus occurrit regi,"* applies to the United States, both as to the federal government and as to the several states, except where express statutory provisions to the contrary exist. Neither in Senate Bill No. 245 nor in our general statutes of limitations have we any provision indicating that the state shall be bound by the statutes of limitations, in actions brought by it, or in its behalf by its officers. We will therefore consider only the grounds urged by counsel for plaintiff, which he claims take this case out of the general rule.

In *Graham v. Russell,* 152 Ind. 186, 52 N. E. 806, Mr. Justice Jordan, who delivered the opinion of the court, in discussing this question, says:

"The county auditor is a public officer. * * * In no sense can it be said that he, as such official, is the owner of the taxes arising out of assessment upon property which, in the discharge of his duties, he secures to be placed upon the tax duplicate; for such taxes, as we have heretofore said, are considered in law as belonging to the state, and the auditor is invested with no

power or rights in any manner to cancel or release the claim of the state for such taxes. The state, as the sovereign power, is the real party in interest, and not the county auditor."

And in *Wasteney v. Schott,* 58 Ohio St. 410, 51 N. E. 34, the first paragraph of the syllabus reads as follows:

"The rule that statutes of limitation do not run against the state unless it is expressly provided is applicable in actions where the state. though not a party to the record, is the real party in interest."

Some states hold that the statute of limitations does not begin to run until the assessment had been made. The state of Missouri has a statute expressly providing that the statute of limitations shall apply to actions brought by the state, but in the case of *State v. Vogelsang,* 183 Mo. 17, 81 S. W. 1087, it was held that the statute of limitations did not begin to run until the assessment was made. To the same effect are *Railroad Co. v. Commw.* 64 Ky. 250; *Perry Co. v. R. R. Co.,* 58 Ala. 546; *Gallup v. Schmidt,* 154 Ind. 196, 56 N. E. 443. *Perry County v. R. R. Co., supra,* held that in Alabama there is no presumption of payment of taxes until after the expiration of 20 years.

As the second contention of counsel on this branch of the case is discussed in another part of this opinion, we will not further notice it here, except to cite *State v. School Dist. No. 3,* 34 Kan. 237, 8 Pac. 208, wherein it is held that the statutes of limitations will not run against the state even where the state holds the debt sued on as assignee or transferee.

Counsel for defendant concedes that the penalty of 50 per cent., provided by section 5933, Wilson's Rev. & Ann. St. 1903, should not be added by the treasurer, and that interest does not attach until the taxes are due. In support of this theory they cite *State v. Redwood Lands,* 40 Minn. 512, 41 N. W. 465, 42 N. W. 473, *Galusha v. Wendt,* 114 Iowa, 597, 87 N. W. 512, and *Beresheim v. Arnd,* 117 Iowa, 83, 90 N. W. 506. The last two cases hold that while the Iowa law permits the treasurer to assess property omitted from taxation for years prior to the passage of the act,

held, on the other hand, that the interest and the penalty could not be charged retrospectively.

*Galusha v. Wendt, supra,* is instructive on a good many of the points raised in the case at bar. In relation to the particular question now under discussion Mr. Justice McClain, who delivered the opinion of the court, says:

"It seems to be conceded that the penalty authorized by the statute cannot be enforced with reference to taxes which should have been assessed prior to the taking effect of the present Code. To enforce such a penal provision retrospectively would be unconstitutional. *Cummings v. Missouri,* 4 Wall. 277, 325, 18 L. Ed. 356; *County of Redwood v. Winona & St. P. Land Co.,* 40 Minn. 512, 41 N. W. 465, 42 N. W. 473; *County of Brown v. Winona & St. P. Land Co.,* 39 Minn. 380, 40 N. W. 166; *Bartruff v. Remey,* 15 Iowa, 257. But the penalty may be enforced as to property omitted after the taking effect of the Code, and the whole section is not rendered unconstitutional by the fact that the provision as to the penalty cannot be applied retrospectively. *Gayer v. Prout,* 48 Ohio St. 89, 26 N. E. 1013. The lower court, while not imposing the 50 per cent. penalty, did compute interest from the time when the taxes on the omitted property, if duly assessed, would have been payable. This interest, we think, is in the nature of a penalty, for the amount of the taxes to be paid was unliquidated until the treasurer made the computation and demanded payment. Interest was therefore improperly included in the amount of the recovery."

A law is not *ex post facto* merely when it is criminal in character, but that doctrine extends to laws which are penal in any form, which provides the imposition of some punitive consequence for its violation, whether it is a fine assessed in a criminal prosecution or a sum to be taken forcibly for the violation of any other process prescribed. The part of Senate Bill No. 245 which provides that "All taxes levied under the provisions shall bear interest and penalties at the same rate as provided by existing laws," in so far as it attempts to operate retrospectively, falls within that class of legislation, and is repugnant to section 15, art. 2, of the Constitution, which prohibits the

enactment of *ex post facto* laws. Black, Interpr. L. 259, 261; *Gager v. Prout, Treas.*, 48 Ohio St. 89, 26 N. E. 1013; *Watson v. Mercer*, 8 Pet. 88-110, 8 L. Ed. 876; *Ryan v. State*, 5 Neb. 276; *Galusha v. Wendt*, 114 Iowa, 597, 87 N. W. 512.

It is next contended that the method provided by Senate Bill No. 245 for assessing escaped or omitted property lacks the essential elements of a hearing upon such notice as to notify, and before such tribunal as is adequate for the determination of the grave questions the exercise of this remedy presents. In other words, it is claimed that the assessment and levying of this tax amounts to taking property without due process of law, and is therefore repugnant to section 7, art. 2 (Bunn's Ed. § 16), of the Constitution, which provides that: "No person shall be deprived of life, liberty, or property, without due process of law."

The following history of this provision is epitomized from the learned and interesting discussion thereof by Prof. Stemson, in his work on Federal and State Constitutions of the United States: The equal right to law was established as early as the Charter of Liberties of Henry II, and extended, not only to the barons, but to all persons except actual slaves, for even the villeins had full law rights. *Magna Charta* recognizes the principle of equality in Caps. 39 and in 40, "To none will we sell, to none will we deny right or justice," and in the preamble conceding these liberties also "To all free men of our kingdom," and expressly in Caps. 60, extending all the foregoing customs and liberties, not only to the king's tenants, but they are to be observed by all others, both clergy and laity, and in Caps. 65 (omitted by Henry III), granting the aforesaid liberties to all men. "By 1485," says Hallam, "the principle that all officers, administrators, or soldiers are liable at the common law for their acts—that is, the prohibition of the continental administrative law—had been fully established"; while in 1566 Speaker Onslow tells Elizabeth herself that she is subject to the common law. So in the Massachusetts

Body of Liberties (clause 2) the same justice and law is extended to every one, whether an inhabitant or a foreigner; and in the Declaration of Independence appears the famous statement that, "All men are created equal," thus extending the principle, established under Henry II 600 years before, that they are only equal before the law.   Caps. 39, *Magna Charta* (1215) provides that:

"No free man shall be taken or imprisoned or disseised, or outlawed, or exiled, or in any ways destroyed; nor will we go upon him nor will we send upon him, unless by the lawful judgment of his peers, or by the law of the land."

It is particularly notable that the words of *Magna Charta* "legal judgment of his peers or the law of the land" are in the statute of 28 Edward III replaced by the words "due process of the law," and the Petition of Right (article 4) quotes the provision in the same words.   It is probable that historically the words are synonymous; that is, "the law of the land" means by indictment and procedure at the common law, and "judgment of his peers" trial by jury, while "due process" includes both.   There is still a feeling that the words "due process of law"will not justify prosecution by information, or in any other manner than a common-law indictment or trial, except by jury.   The Supreme Court of the United States, however, held that "due process of law" does not necessarily include trial by jury, or, in certain cases, any court trial.   Particularly is this the rule in relation to proceedings for raising revenue for the support of government. *McMillen v. Anderson*, 95 U. S. 37, 24 L. Ed. 335; *Kentucky Railroad Tax Cases*, 115 U. S. 321, 6 Sup. Ct. 57, 29 L. Ed. 414; *Lent v. Tillson*, 140 U. S. 316, 11 Sup. Ct. 825, 35 L. Ed. 419; *King v. Mullins*, 171 U. S. 404, 18 Sup. Ct. 925, 43 L. Ed. 214.

The courts of this country have uniformly held that the necessity of revenue for the support of the government does not admit of the delay attendant upon proceedings in a court of justice, and that they are not required for the enforcement of taxes or assessments.   In *Hagar v. Reclamation District*, 111 U. S. 701, 4 Sup. Ct. 663, 28 L. Ed. 569, it was held:

"Where the taking of property is in the enforcement of a tax, the proceeding is necessarily less formal, and whether notice to him is at all necessary may depend upon the character of the tax, and the manner in which its amount is determinable. The necessity of revenue for the support of the government does not admit of the delay attendant upon proceedings in a court of justice, and they are not required for the enforcement of taxes or assessments. * * * Of the different kinds of taxes which the state may impose there is a vast number of which, from their nature, no notice can be given to the taxpayer, nor would notice be of any possible advantage to him, such as poll taxes, license taxes (not dependent upon the extent of his business), and, generally, specific taxes on things or persons or occupations. In such cases the Legislature in authorizing the tax fixes its amount, and that is the end of the matter."

It would seem from an examination of the authorities that due process of law does not always require judicial hearings, except in matters of purely judicial nature, but not in matters of taxation, or matters purely administrative in their nature. *State v. Sponaugle et al.*, 45 W. Va. 415, 32 S. E. 283, 43 L. R. A. 727. In such cases notice is required, which notice must be reasonable, and it must afford parties a reasonable opportunity to be heard before an impartial tribunal. *Violett v. Alexandria,* 92 Va. 561, 23 S. E. 909, 31 L. R. A. 382, 53 Am. St. Rep. 825. It was held in *People v. Turner,* 117 N. Y. 227, 22 N. E. 1022, 15 Am. St. Rep. 498, and *Spencer v. Merchant,* 100 N. Y. 585, 3 N. E. 682, that an opportunity afforded the taxpayer to appear before the board of supervisors and challenge the legality and fairness of his assessment was a satisfaction of his rights in respect to a hearing on the subject.

Senate Bill No. 245 provides that:

"Before listing and assessing the property discovered, the county treasurer shall give the person in whose name it is proposed to assess the same, ten days' notice thereof by registered letter, addressed to him at his last known place of residence, fixing the time and place when objections in writing to such proposed listing and assessment may be made. An appeal may be taken to

the county court from the final action of the treasurer within ten days, by giving notice thereof in writing and filing an appeal bond as in cases appealed from the board of county commissioners to the district court."

This provision clearly contemplates a hearing before the treasurer, and a trial *de novo* in the county court on all issues raised before the treasurer if appeal is taken. A law authorizing the assessment and collection of taxes on omitted property does not infringe section 7, art. 2, of the Constitution, which provides that, "No person shall be deprived of life, liberty, or property, without due process of law," if the owner has an opportunity to question the validity or the amount of it, either before that amount is determined or in subsequent proceedings for its collection. This law to our mind gives such opportunity, and that is all the taxpayer is entitled to. The Iowa act of March, 1900 (Laws 1900, p. 33, c. 50), section 1, is identical with section 1 of our act, except as to the court in which appeals may be taken. Under the Iowa act hearings have been had before the treasurer, and the Supreme Court of that state has held that the treasurer must hear evidence in order to arrive at the value of the property at the time the assessment of the omitted property should have been made. *Gibson v. Clark*, 131 Iowa, 325, 108 N. W. 527. The Supreme Court of Iowa has also held that the taxpayer is entitled to a trial *de novo* in the district court on all issues raised by him before the treasurer. *Gibson v. Cooley*, 129 Iowa, 529, 105 N. W. 1011; *Schoonover v. Patcina*, 126 Iowa, 261, 100 N. W. 490.

Counsel for plaintiff also raises the objection that appeals cannot be taken to the county court because that court, under the Constitution, has no such appellate jurisdiction. Counsel argues that section 14 of article 7 (Bunn's Ed. § 186), which provides that: "Until otherwise provided by law, the county court shall have jurisdiction of all cases on appeals, from judgments of the justices of the peace in civil and criminal cases; and in all cases civil and criminal, appealed from justices of the peace to such county court, there shall be a trial *de novo* on questions of both

law and fact" constitutes a limitation upon the appellate juris-
diction of the county court. We cannot agree with counsel that
the Legislature could not confer on the county court appellate
jurisdiction in summary quasi judicial proceedings. The proceed-
ing before the treasurer is not an action at law, nor a suit in
equity, but a summary proceeding of a quasi judicial nature.
*Shearer v. Citizens' Bank,* 129 Iowa, 564, 105 N. W. 1025. The
Constitution gives the county court jurisdiction concurrent with
the district court in civil actions where the amount involved does
not exceed $1,000, with certain excepted cases. A proceeding for
the assessment and collection of taxes due on omitted property is
not a civil action. It is a remedial proceeding, granted by the
Legislature, conferring upon the treasurer a remedial right and
duty, not heretofore existing, for the collection of taxes due on
omitted property, and, as a matter of grace, the Legislature gave
the taxpayer the right of appeal to the county court, where said
summary proceeding may be heard *de novo.* It makes no difference
whether the amount of taxes involved in any particular case ex-
ceeds $1,000; this being neither an action at law nor a suit in
equity.

    The principle involved here was before the Supreme Court
of the territory of Oklahoma in the case of *Central Loan & Trust
Co. v. Campbell Commission Co.,* 5 Okla. 396, 49 Pac. 48. This
was a case involving the power of the territorial Legislature to
confer upon the probate judge the right to issue an attachment
in cases pending in the district court when the judge of the dis-
trict court was absent from the county. It was argued that this
would be depriving the district court of a part of its jurisdiction
under the Organic Act, and the case of *Ferris v. Higley,* 20 Wall.
375, 22 L. Ed. 383, was cited in support of the contention. This case
held that the Legislature of Utah could not confer upon the pro-
bate court chancery jurisdiction, because under the Organic Act of
Utah the district and Supreme Courts were vested with all chancery
jurisdiction. In discussing the Utah case, and distinguishing it

from *Central Loan & Trust Co. v. Campbell Commission Co.,* *supra,* Mr. Justice Tarsney says:

"Mr. Justice Miller, speaking for the court, declared this act to be unconstitutional, but the broad distinction between that act and the one we are considering is readily apparent. The judicial power which it sought to confer upon probate courts was not that arising upon a legislative cause of action or legislative rem- edial procedure which the Legislature might have entirely dispensed with or might have conferred upon a mere ministerial officer, but that act attempted to confer upon the probate court full concurrent jurisdiction with the district court in all matters civil and criminal, as well in chancery as at common law. This the court rightly held they could not do; and while the learned judge in the opinion uses language from which it has been argued that the court intended to hold that in Utah, under an Organic Act identical with ours, the jurisdiction of probate courts was confined exclusively to matters of probate, and that their jurisdiction could not be enlarged by legislative enactment, we think his language, carefully read, will bear no such interpretation, but that the true interpretation thereof makes it to mean that Congress, in conferring on supreme and district courts power of general jurisdiction in civil and criminal cases, specifically vesting in them common-law and chancery jurisdiction, did not intend to leave it to the territorial Legislature to confer a general jurisdiction upon probate courts, or to vest them with the essential nature or jurisdiction of the supreme and district courts; or to authorize the Legislature to modify, in essential particulars, the Constitution or jurisdiction of those courts. But it was not intended in that case to hold that the legislative power was so restricted that they might not confer jurisdiction upon the probate courts, or the judge thereof, in matters which did not impair the essential nature or jurisdiction of the supreme or district courts, or relate to common-law or chancery jurisdiction, for in the opinion the learned judge says: 'We are not prepared to say that, in deciding what law is meant in this phrase "as limited by law," we are wholly to exclude laws made by the Legislature of the territory. There may be cases where the Legislature, conferring new rights or new remedies, or establishing anomalous rules of proceedings within their legislative power, may direct in what court they shall be had. Nor are we called on to deny that the functions and powers of the

probate court may be more specifically defined by territorial statutes within the limits of the general idea of the nature of probate courts, or that certain duties, not strictly of that character, may be imposed upon them by the Legislature.' "

The distinction sought to be drawn here between a quasi judicial tribunal and a court of judicature is made clear in *Muir's Adm'rs v. City of Bardstown,* 120 Ky. 739, 87 S. W. 1096. In that case the city of Bardstown passed an ordinance providing for the assessment and collection of taxes on omitted property by the city authorities. It was contended that the ordinance was violative of the constitutional limitations on the Legislature to create any tribunals other than the courts expressly named in that instrument. Mr. Justice O'Rear, who delivered the opinion of the court, in denying this construction, says:

"The next objection to the ordinance is that by it the council has conferred upon itself jurisdiction of a judicial nature, which violates the constitutional limitations, upon the part of the Legislature, to create any judicial tribunals other than the courts expressly named in that instrument. In assessing omitted property the act partakes somewhat of ministerial and somewhat of judicial or quasi judicial functions. That is to say, the act in listing of the property for taxation is clearly a ministerial act; and, as an incident, it finds the fact whether the property was in fact omitted, whether it belonged to the alleged recusant taxpayer, and what its fair value then was. To hear evidence, and therefrom to find, whether a certain fact was or was not, partakes of judicial functions. Still it is not necessarily judicial in the sense that it is an act of a court. Many ministerial acts include in part the determination of pre-existing facts, and the exercising of the quality of judgment sometimes called 'discretion' with respect thereto. For that matter the town assessor does precisely that thing, or may do so, in every instance where he assesses property. It is not believed by any that he is a judicial officer because of that fact. The county court clerk, in admitting a deed to record, proven by the oaths of attesting witnesses, does the same. The State Board of Valuation and Assessment in assessing corporate franchises, and the Railroad Commissioners in assessing corporeal property of the railroads, do the same. Election officers, in passing upon the rights of an applicant to vote, also exercise these functions.

They are in the nature of preliminary inquiries to put the officer in possession of the facts indicating whether or not he must act officially and how. They are all subject to collateral attack when subject to attack at all. But the finding or judgment of a court having jurisdiction of the cause is essentially different. There must generally be two or more litigants. An issue of law or fact must be joined by them, within the jurisdiction of the tribunal, with respect to property, or some personal right in which the litigants are interested. Its conclusion must be binding upon the parties until reversed or set aside in the manner provided by law for opening up judgments of courts. To hear evidence, to swear witnesses, to impanel a jury if the case admits of it, to punish for contempt, to compel parties and witnesses to attend, and finally to enter a judgment settling the matter in dispute, are the distinguishing features of a court of judicature. Master commissioners—commissoners to condemn rights of way for railroads and other purposes—are not courts, nor are assessing officers, boards of review or of equalization of assessments. The action of the council in assessing omitted property is purely ministerial, although it has mixed certain discretion, as to finding values, and the like, which is not reviewable, and which quality is sometimes called 'judicial,' though it is not judicial in the sense that it is the act of a court."

The question involved here was before this court in another form in *State v. Hooker, ante,* p. 712, 98 Pac. 964. It was insisted there that certain sections of the enforcement act were repugnant to the prohibitory clause of the Constitution; that the Constitution defined the bounds of the liquor traffic within the state, and the provision constituted an implied prohibition against legislative interference to add to the condition or extend the powers to other cases not covered by the constitutional provision, and *Holley v. State,* 14 Tex. App. 505, was cited in support of this contention. In discussing this proposition, Mr. Chief Justice Williams, who delivered the opinon of the court, says:

"In creating the legislative department, and in conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of this country, subject

only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department of a state is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at discretion."

The Chief Justice, in distinguishing that case from *Holley v. State, supra,* says:

"There are three reasons why the case of *Holley v. State, supra,* is not applicable to this case: First, the Texas Constitution of 1875 does not contain a provision similar to that of section 36, art. 5 (Bunn's Ed. § 109), *supra.*"

This section of the Constitution provides that:

"Any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subjects whatsoever."

It is held that this provision was incorporated into the Constitution to exclude the idea of the exclusion of power by implication. The sixth paragraph of the syllabus reads as follows:

"A restriction or limitation upon the power of the Legislature upon any subject of legislation will not be presumed or implied, unless from the entire instrument it clearly appears that it was so intended."

We believe we have noticed all objections urged by counsel to the validity of this law. We have examined with care the great number of authorities cited by counsel for both parties, as well as the briefs filed in *Gamble, Administratrix, v. Patrick, Treas. Kingfisher Co.,* reported in this volume [99 Pac. 640.]

A great many states have found it necessary to pass laws, such as the one under consideration, in order to equalize the burdens of supporting the state between those honest and patriotic property owners who return their property for taxation and pay taxes upon the same and the property owner who shirks, or for any reason escapes, this duty. In nearly every case where an attempt has been made to compel such derelicts to render some return by way of taxation for the blessings of organized govern-

ment the law has been bitterly assailed upon every possible pretext. All of the grounds of attack urged in the case at bar have been urged in other courts, in states where similar statutes have been enacted, and in none of them have the laws been held to be invalid, except the earlier law in the state of Mississippi, which was essentially different from our act. It may be that Senate Bill No. 245 is not as complete a piece of legislation as possible, but we believe it is adequate for the purposes for which it was enacted, and infringes no vested rights of the persons affected by it. That it may be capable of improvement is a matter with which we have nothing to do. That is with the Legislature. "Judges ought to remember that their office is *jus dicere*, and not *jus dare*—to interpret law, and not to make law, or give law." The rule laid down by Mr. Chief Justice Marshall in *Fletcher v. Peck*, 6 Cranch, 87-128, 3 L. Ed. 162, is sound and salutary:

"The question, whether a law be void for its repugnancy to the Constitution is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. * * * But it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

Applying this rule to the case at bar, we are led to the conclusion that Senate Bill No. 245 is a valid law, except in the particulars pointed out in this opinion, and the writ of prohibition prayed for is therefore denied.

All the Justices concur.